[No. D050037. Fourth Dist., Div. One. Feb. 25, 2008.]

In re CARL N., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
CARL N., Defendant and Appellant.

COUNSEL

Ava R. Stralla, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Ronald A. Jakob and David Delgado-Rucci, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**NARES, J.**—Carl N., a ward of the juvenile court, who was born in 1988 and has a long history of juvenile delinquency (including vandalism, gang activity, drug abuse, a felony assault, and multiple violations of probation) and repeated failure to benefit from less restrictive commitments, appeals an order committing him to the California Youth Authority (CYA)[1] after he admitted he had again violated probation. Carl contends the court abused its

---

[1] "Commencing July 1, 2005, any reference to the Department of the Youth Authority refers to the Department of Corrections and Rehabilitation, Division of Juvenile Facilities, which has jurisdiction over all educational training and treatment institutions now or hereafter established and maintained in the state as correctional schools for the reception of wards of the juvenile court and other persons committed to the department." (Welf. & Inst. Code, § 1000; see also *In re Lemanuel C.* (2007) 41 Cal.4th 33, 37, fn. 2 [58 Cal.Rptr.3d 597; 158 P.3d 148].) Since the parties both refer to the CYA, we shall as well for the sake of clarity and consistency.

discretion because there was no evidence demonstrating that he would likely benefit from a CYA commitment or that the commitment would meet his reformatory, educational, discipline or treatment needs or that the public would be safer. We affirm the CYA commitment.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *First Petition (November 2001)*

In November 2001, the District Attorney of San Diego County filed a petition under Welfare and Institutions Code[2] section 602, alleging that Carl had committed petty theft (Pen. Code, §§ 484, 488) and misdemeanor battery (Pen. Code, § 242). Carl admitted the petition's allegations, and in January 2002, the court adjudged him a ward of the court (§ 602), placed him under the care, custody and control of the San Diego County Probation Department, and placed him with his father under numerous terms and conditions.

Carl repeatedly violated his probation. He was twice arrested in October 2002 for defacing school property with graffiti. That month he was also arrested for shoplifting. He twice left his court-ordered placement without his father's permission, he was absent from school and suspended on several occasions, he was cited for being out past curfew, he tested positive for marijuana three times, and he failed to attend substance abuse counseling as directed.

In December 2002, Carl admitted leaving his court-ordered placement and was detained in juvenile hall pending disposition. At the disposition hearing, the court continued Carl as a ward and placed him with his father on condition Carl complete 30 days on house arrest under the electronic surveillance program. The next day he was again before the juvenile court and detained because he ran away after one day in the electronic surveillance program. The court ordered Carl committed to "Breaking Cycles" for a period not to exceed 90 days.

### B. *Second Petition (March 2003)*

In March 2003, another section 602 petition was filed against Carl, alleging that earlier that month he had committed five offenses: vandalism/graffiti; possession of drill bits, cutters or certain other tools with intent to commit vandalism; resisting arrest; violating curfew; and vandalism by defacing a

---

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

school with graffiti. Carl admitted the vandalism/graffiti (count 1; Pen. Code, § 594, subds. (a), (b)(2)(A)) and resisting arrest (count 3; Pen. Code, § 148) allegations, and the remaining counts were dismissed with a *Harvey* waiver.[3]

The court continued Carl as a ward; granted him probation with terms and conditions, including not associating with Shell Town Gang members and not possessing any gang paraphernalia; and committed him to Breaking Cycles for a period not to exceed 240 days, recommending placement in the "Drug Dorm."

In early July 2003, Carl was reported absent without leave (AWOL) after leaving his court-ordered placement without permission from his mother or probation officer, and remained AWOL for about six months. According to his mother, Carl was in Tijuana, Mexico, with his grandfather.

In late January 2004, Carl surrendered to juvenile hall staff. At the detention hearing, he admitted violating probation by leaving placement without permission. The court placed him in the home supervision program at his father's home under numerous terms and conditions.

Shortly thereafter, in mid-February 2004, Carl admitted he violated probation and home supervision by leaving his placement without a parent and without permission. The court ordered him committed to Breaking Cycles for a period not to exceed 365 days.

In mid-September 2004, Carl admitted he violated probation by using marijuana, alcohol, and methamphetamine, for which he tested positive. The court ordered Carl detained in juvenile hall pending reassessment in Breaking Cycles.

In mid-December 2004, Carl's case was reassigned to the juvenile gang suppression unit after the San Diego Probation Department's Juvenile Ranch Facility staff intercepted two photographs showing him holding what appeared to be handguns. Carl was released from Juvenile Ranch Facility, placed with his father, and then transitioned to the youth day center program. Later that month the court ordered Carl to pay $144 in restitution to the NewSchool of Architecture and Design.

In January 2005, Carl was arrested and booked into juvenile hall for violating probation by failing to attend school, being absent from home

---

[3] *People v. Harvey* (1979) 25 Cal.3d 754 [159 Cal.Rptr. 696, 602 P.2d 396]. A *Harvey* waiver permits a sentencing court to consider counts that were dismissed under a plea bargain and that are not transactionally related to the admitted offense. (3 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Punishment, § 274, p. 361; see *Harvey, supra,* 25 Cal.3d at pp. 758–759.)

without leave, and failing to report to his probation officer. He was released from juvenile hall following an 11-day Breaking Cycles administrative removal for violating probation, and was placed with his father on condition he complete two weeks in the electronic surveillance program. However, the program equipment was never installed because Carl went AWOL from his father's home a few days later. Later that month Carl's father left a voice message with Carl's probation officer stating that Carl was going to Tijuana to live with his maternal grandmother. In mid-February 2005, the court issued a bench warrant for Carl's arrest.

### C. *Third Petition (February 2005)*

In late February 2005, San Diego police officers noticed a vehicle with the driver's side window smashed out. They saw four individuals, one of whom was holding a baseball bat, walking northbound. Believing they were responsible for the broken window, the officers made a U-turn in an unsuccessful attempt to contact them. Later, an officer saw a male, who also saw the officer, walking north on a nearby street. After a 20-minute pursuit on foot, that male was apprehended and the officer found Carl hiding behind a fence on that same street. Carl was booked into juvenile hall.

In late February 2005, the district attorney filed a section 602 petition alleging that Carl resisted arrest (Pen. Code, § 148, subd. (a)(1)) and violated curfew (San Diego Mun. Code, § 58.0102, subd. (a)). In March of that year, the court recalled the bench warrant and ordered Carl detained in juvenile hall pending further hearing.

In March 2005, the court ordered Carl committed to Camp Barrett for a period not to exceed 270 days. Carl was placed there in early May of that year.

### D. *Fourth Petition (August 2005)*

In early August 2005, while Camp Barrett residents were returning from lunch and lining up on the basketball court, Carl was told to sit on a bench because of improper behavior. As he walked past another ward, Carl hit him in the back of the head. Several officers yelled, "Cover." The other ward complied, but Carl did not and continued to hit the other ward. The same command was given again, but Carl ignored it and continued hitting and then began to kick the other ward, who was in the cover position. Carl finally assumed that position after he was pepper-sprayed. He was administratively removed from Camp Barrett, and a report was submitted to the juvenile division of the San Diego County District Attorney's Office for review. Carl's placement at Camp Barrett was administratively terminated. During that

placement, Carl had committed 10 rule violations for defiance, tagging, gang-related activity, possessing contraband and fighting.

In mid-August 2005, the District Attorney of San Diego County filed a section 602 petition alleging that Carl committed an assault by means of force likely to produce great bodily injury, resisted arrest, and committed a battery. Carl admitted committing the assault (count 1; Pen. Code, § 245, subd. (a)). The court sustained the petition on count 1 and dismissed the other counts with a *Harvey* waiver. The court committed him to Camp Barrett for a period not to exceed 270 days.

In early January 2006, after Carl successfully completed his Camp Barrett commitment, the court continued him as a ward and placed him with his father.

However, in mid-January 2006, the probation officers and San Diego police officers conducted a compliance check and Fourth Amendment waiver search at Carl's residence. The officers confiscated gang paraphernalia, which included gang writing on several pieces of paper and a baseball bat with gang graffiti. Carl was arrested and taken to juvenile hall. He admitted to police that he committed vandalism by tagging the words "Scooby, I'm Back" in his neighborhood on the day of his release from Camp Barrett. He also admitted tagging "Scooby" and crossing out "KN" within the last week. The court ordered that Carl continue to be detained in juvenile hall for probation violation.

### E.  *Fifth Petition (February 2006)*

In late February 2006, the district attorney filed a section 602 petition alleging that Carl committed vandalism (Pen. Code, § 594, subds. (a), (b)(1)) for the benefit of a criminal street gang (Pen. Code, § 186.22, subd. (b)(1)). Carl admitted committing the vandalism offense, and the court sustained the petition as to that count.

At the contested disposition hearing in March 2006, Carl gave the court a letter from his father's employer, which stated that Carl would have a job when released. The court placed Carl with his father on condition that Carl complete 30 days on home supervision as directed by the probation officer and that he have no visitors at his home except family members approved by his parents.

In mid-April 2006, the probation officer arrested Carl for violation of his probation conditions by associating with gang members and possession of gang graffiti. At the time of the arrest, a documented gang member was in the

front yard talking to Carl's uncle. The probation officer had directed this same gang member not to be at Carl's mother's residence. Carl admitted leaving the County of San Diego without permission and going to Tijuana, where he was involved in a physical altercation and was arrested. Carl also admitted using alcohol and marijuana sometime in the previous 45 days.

At the April 2006 detention hearing, Carl admitted he had committed four probation violations: possession of gang paraphernalia, failing to obey all laws, leaving the County of San Diego without permission, and possession of alcohol or controlled substances without a prescription. The court committed him to Camp Barrett for a period not to exceed 270 days. The court ordered the juvenile forensics services facility to evaluate Carl. Carl was evaluated and diagnosed with attention deficit hyperactivity disorder (ADHD) and conduct disorder. A second evaluation concluded he had a history of mood disorder not otherwise specified, disruptive behavior disorder not otherwise specified, and polysubstance abuse. It ruled out ADHD until the findings could be discussed with Carl's mother. In early June 2006, Carl was transported to Camp Barrett.

At the annual review hearing in late August 2006, the court continued Carl's commitment to Camp Barrett and ordered him to reside with his mother upon completion of the program.

In late October 2006, the San Diego County Probation Department and the San Diego Police Department were completing compliance checks and Fourth Amendment waiver searches on gang members in the southeastern portion of San Diego. As gang suppression officers approached Carl's residence, Carl and a companion attempted to run out the back door of the home. A Fourth Amendment waiver search was conducted at the residence, and the officers confiscated numerous items of gang paraphernalia. The probation officer also noted that Carl was associating with a TNS gang member.

Carl admitted he violated probation by associating with a known gang member and possessing gang paraphernalia. The court ordered him continued as a ward and placed him in jail because he had reached 18 years of age.

In mid-November 2006, the screening committee of the probation department reviewed Carl's case and recommended that he be committed to the CYA. The California Department of Corrections and Rehabilitation screening committee also reviewed the matter and noted that Carl's most serious true finding was the assault by means likely to produce great bodily injury, which qualified him as a "Category 5" offender. Carl would receive high school classes, gang awareness classes, substance abuse counseling, an anger management course, and a class "involving the impact of the victim as a result of the offense."

The probation officer noted in his probation violation report that Carl continued to associate with known gang members and refused to change his gang lifestyle. Over the previous five years, Carl had been committed to Breaking Cycles for 90-, 240- and 365-day commitments and had received a reassessment with Breaking Cycles. He was committed to Camp Barrett for 270 days on three separate occasions. When he was released from Camp Barrett in early September 2006, he was out of custody for less than two months before he violated his probation by associating with another gang member and possessing gang paraphernalia. The probation officer noted that Carl "presents a risk to the community" because of the true findings for assault, battery and vandalism, and an enhancement for associating with a street gang member.

The probation officer recommended that Carl be committed to the CYA because local services available to him had been exhausted due to Carl's age (18), sophistication, and the risk he presented to others. The probation officer noted that Carl failed to stay law abiding during his probation and failed to rehabilitate, and he believed CYA would be able to provide additional services that best suited Carl's rehabilitative needs.

### F. CYA Commitment Order and Carl's Appeal

At the contested December 6, 2006 disposition hearing, the court was informed that Carl's parents wanted him to go to Yuma, Arizona, to live with an aunt and uncle. The court informed Carl's parents that more concrete facts needed to be presented, such as an actual Yuma residence and job opportunity. The court committed Carl to the CYA. The court found that Carl's "mental and physical condition and qualifications render it probable that he['ll] be benefited by the reformatory, education, discipline or other treatment provided by the [CYA]." This appeal followed.

## DISCUSSION

### I. APPEAL

Carl contends the court abused its discretion in committing him to the CYA because there was no evidence to show he would likely benefit from a CYA commitment or that the commitment would meet his reformatory, educational, discipline or treatment needs or that the public would be safer. We reject this contention and affirm the CYA commitment.

### A. Standard of Review and Legal Principles Governing Commitments to CYA

The decision of the juvenile court to commit a juvenile offender to CYA may be reversed on appeal only by a showing that the court abused its

discretion. (*In re Michael D.* (1987) 188 Cal.App.3d 1392, 1395 [234 Cal.Rptr. 103].) "[D]iscretion is abused whenever the court exceeds the bounds of reason, all of the circumstances being considered." (*People v. Giminez* (1975) 14 Cal.3d 68, 72 [120 Cal.Rptr. 577, 534 P.2d 65].)

As the court explained in *In re Michael D., supra*, 188 Cal.App.3d at page 1395, "[a]n appellate court will not lightly substitute its decision for that rendered by the juvenile court. We must indulge all reasonable inferences to support the decision of the juvenile court and will not disturb its findings when there is substantial evidence to support them. [Citations.] In determining whether there was substantial evidence to support the commitment, we must examine the record presented at the disposition hearing in light of the purposes of the Juvenile Court Law."

The statutory declaration of the purposes of the juvenile court law is set forth in section 202. (10 Witkin, Summary of Cal. Law (10th ed. 2005) § 442, pp. 551–552.) Before the 1984 amendment to section 202, California courts consistently held that " '[j]uvenile commitment proceedings are designed for the purposes of rehabilitation and treatment, not punishment.' " (*In re Michael D., supra*, 188 Cal.App.3d at p. 1396, quoting *In re Aline D.* (1975) 14 Cal.3d 557, 567 [121 Cal.Rptr. 816, 536 P.2d 65].) California courts treated a commitment to CYA as "the placement of last resort" for juvenile offenders. (*In re Michael D., supra*, 188 Cal.App.3d at p. 1396.)

However, "[i]n 1984, the Legislature replaced the provisions of section 202 with new language which emphasized different priorities for the juvenile justice system." (*In re Michael D., supra*, 188 Cal.App.3d at p. 1396, citing Stats. 1984, ch. 756, §§ 1, 2, pp. 2726–2727.) Section 202, subdivision (b) (hereafter section 202(b)) now recognizes punishment as a rehabilitative tool. (*In re Michael D., supra*, 188 Cal.App.3d at p. 1396.) That subdivision provides in part: "Minors under the jurisdiction of the juvenile court who are in need of protective services shall receive care, treatment, and guidance consistent with their best interest and the best interest of the public. Minors under the jurisdiction of the juvenile court as a consequence of delinquent conduct shall, in conformity with the interests of public safety and protection, receive care, treatment, and guidance that is consistent with their best interest, that holds them accountable for their behavior, and that is appropriate for their circumstances. *This guidance may include punishment that is consistent with the rehabilitative objectives of this chapter.*" (§ 202(b), italics added.)

"Section 202 also shifted its emphasis from a primarily less restrictive alternative approach oriented towards the benefit of the minor to the express 'protection and safety of the public' [citations], where care, treatment, and guidance shall conform to the interests of public safety and protection.

[Citation.]" (*In re Michael D., supra*, 188 Cal.App.3d at p. 1396.) "Thus, it is clear that the Legislature intended to place greater emphasis on punishment for rehabilitative purposes and on a restrictive commitment as a means of protecting the public safety." (*Ibid.*) It is also clear, as the Court of Appeal recognized in *In re Asean D.* (1993) 14 Cal.App.4th 467, 473 [17 Cal.Rptr.2d 572], that a commitment to CYA "may be made in the first instance, without previous resort to less restrictive placements."

"[T]his interpretation by no means loses sight of the 'rehabilitative objectives' of the Juvenile Court Law. [Citation.] Because commitment to CYA cannot be based solely on retribution grounds [citation], there must continue to be evidence demonstrating (1) probable benefit to the minor and (2) that less restrictive alternatives are ineffective or inappropriate. However, these must be taken together with the Legislature's purposes in amending the Juvenile Court Law." (*In re Michael D., supra*, 188 Cal.App.3d at p. 1396.)

B.  *Analysis*

Applying the standard of review, legal principles, and legislative objectives we have discussed, we turn to the record before us. Before it made its findings, the court stated it was "reluctant" to send minors to CYA, which it called "a special place reserved for special minors who either commit crimes so egregious they deserve to go there, or they earned their way to CYA." Noting it had considered "all of the . . . arguments made [and] evidence presented," the court found that Carl had "certainly" earned the commitment to CYA. Acknowledging its "policy of graduated sanctions," the court recounted the numerous grants of probation and home supervision it had given to Carl, as well as the rehabilitative programs it had ordered: "Carl has since [2001], now five years, been in front of this court. He has had dispositions including straight release to his father. Next time was home supervision for 30 days. Next time was Breaking Cycles for 90 days. Next time was Breaking Cycles for 240 days. Next time was Breaking Cycles for 365 days. Next time [he] was reassessed [for] Breaking Cycles. Next time was Camp Barrett [for] 270 days. Next time was [a] new commitment to Camp Barrett [for] 270 days. Next time after that was a third commitment to Camp Barrett for 270 days. So in the scheme of graduated sanctions the obvious step is CYA." The record shows the court's chronology was accurate and supported by substantial evidence.

The court also found that Carl had admitted violating conditions of probation on eight different occasions, and those violations "involv[ed] going AWOL, testing positive for marijuana [and] methamphetamine, using graffiti; associating with gang members, and various other violations." The record also supports these findings. Even after recounting some of Carl's admitted

violations of probation, the court commented that "[e]ven that scheme does not necessarily mean that Carl has earned his way into [CYA]."

The court then noted the incident in which Carl committed vandalism through the use of graffiti almost immediately after he was released from Camp Barrett. The record shows that in mid-January 2006, after the police found gang paraphernalia at Carl's residence and arrested him, Carl admitted that he committed vandalism by tagging the words "Scooby, I'm Back" in his neighborhood on the day of his release from Camp Barrett. The court stated that when Carl next appeared in court for violation of probation, it told Carl, "I can't believe that you would do something like that."

The record shows that Carl's probation officer arrested him in mid-April 2006 for violation of his probation conditions by associating with gang members and possession of gang graffiti, and Carl admitted leaving the County of San Diego without permission and going to Tijuana, where he was involved in a physical altercation, and was arrested. Carl also admitted using alcohol and marijuana sometime in the last 45 days.

The court considered the foregoing events, stating, "I trusted Carl that perhaps he had finally grown up. And it wasn't a month he was back in front of me[,] [h]aving gone down to Tijuana, got into a fight . . . and admitted to using alcohol and drugs, where he admitted to reassociating with gangs . . . ."

The court had been informed that Carl's parents wanted him to go to Yuma, Arizona to live with an aunt and uncle. Carl's counsel informed the court that a letter from Carl's uncle indicated the uncle was trying to get Carl a job in Yuma. The court, however, informed Carl's parents that more concrete facts needed to be presented, such as an actual Yuma residence and job opportunity. Carl's mother initially told the court that the entire family would be moving to Yuma with Carl. However, she later admitted that her brother (Carl's uncle), who was a drywall employee, had been injured on the job, he was going to receive workers' compensation benefits, and he was going to use that money to open up his own company. When the court asked, "And he is not yet back to work, these are just plans to go back to work?," Carl's mother replied, "He can do some stuff, you know."

The court concluded that "[o]ur attempts at rehabilitation have not worked—simple as that. Carl and his family, as evidenced by the pictures, have not taken us very seriously." The court was referring to a photograph showing Carl with his mother at Camp Barrett as Carl was using his hands to give a gang sign, and another photograph showing Carl's sister throwing gang signs.

Regarding the plan to send Carl to Yuma, the court stated, "I have considered sending Carl to Yuma, Arizona as recommended. But I am not

going to accept that. That is not far enough away, time and distance . . . . If the gangs . . . are in Yuma, Carl will find them. If they're not in Yuma they'll come from here to see him. There [are] no plans. There is no job." The court found "no assurances that Carl will stay in Yuma[, or,] if he does stay in Yuma he'll stay away from the gang culture. It's just, frankly, not a viable alternative." The court agreed with the probation officer that CYA will be able to provide additional services to Carl that can best suit his rehabilitative needs regarding substance abuse, education, anger management and gang involvement.

■ We conclude the court did not abuse its discretion by committing Carl to CYA because there is substantial evidence in the record to show it is probable such commitment will benefit him, and a less restrictive placement alternative would be ineffective and inappropriate and would not adequately promote public safety or serve the societal interest in punishment and rehabilitation.

## II. *CARL'S PETITION FOR REHEARING*[4]

In his petition for rehearing, Carl contends this court should vacate his CYA commitment and remand this case for a new disposition hearing because (1) effective September 1, 2007, the California Legislature amended sections 731 and 733 "greatly restrict[ing] the juvenile cases for which there can be a [CYA] commitment," and (2) this change in the law should apply retroactively to all cases, such as this, that were not final as of September 1, 2007. We reject these contentions and conclude that section 731.1 (discussed, *post*), which also took effect on that date, rather than sections 731 and 733, governs this case.

### A. *2007 amendments to sections 731 and 733 and enactment of section 731.1*

Former section 731, subdivision (a)(4), as amended by Statutes 2007, chapter 175, section 19, and as operative September 1, 2007 (hereafter section 731(a)(4)) provided in part: "(a) If a minor is adjudged a ward of the court on the ground that he or she is a person described by Section 602, the court . . . may do any of the following: [¶] . . . [¶] (4) Commit the ward to the

---

[4] This court granted Carl's petition for rehearing on December 21, 2007. On that date, pursuant to this court's written request dated December 13, 2007, the People submitted a letter brief in response to that petition.

Department of Corrections and Rehabilitation, Division of Juvenile Facilities, *if the ward has committed an offense described in subdivision (b) of Section 707.*"[5] (Italics added.)

Former section 733 was repealed by Statutes 2007, chapter 175, section 21. Section 733, subdivision (c) (hereafter section 733(c)), which pertains to prohibited juvenile commitments and was added by Statutes 2007, chapter 175, section 22, provides: "A ward of the juvenile court who meets any condition described below shall *not* be committed to the Department of Corrections and Rehabilitation, Division of Juvenile Facilities: [¶] . . . [¶] (c) The ward has been or is adjudged a ward of the court pursuant to Section 602, and *the most recent offense alleged in any petition and admitted or found to be true by the court is not described in subdivision (b) of Section 707*, unless the offense is a sex offense set forth in paragraph (3) of subdivision (d) of Section 290 of the Penal Code. This subdivision shall be effective on and after September 1, 2007." (Italics added.)

Section 731.1, which governs the recall of a ward commitment, was also added by Statutes 2007, chapter 175, section 20 and became operative on September 1, 2007. That section provides: *"Notwithstanding any other law, the court committing a ward to the Department of Corrections and Rehabilitation, Division of Juvenile Facilities, upon the recommendation of the chief probation officer of the county, may recall that commitment in the case of any ward whose commitment offense was not an offense listed in subdivision (b) of Section 707, unless the offense was a sex offense set forth in paragraph (3) of subdivision (d) of Section 290 of the Penal Code, and who remains confined in an institution operated by the division on or after September 1, 2007. Upon recall of the ward, the court shall set and convene a recall disposition hearing for the purpose of ordering an alternative disposition for the ward that is appropriate under all of the circumstances prevailing in the case.* The court shall provide to the division no less than 15 days advance notice of the recall hearing date, and the division shall transport and deliver the ward to the custody of the probation department of the committing county no less than five days prior to the scheduled date of the recall hearing. Pending the recall disposition hearing, the ward shall be detained or housed in the manner and place, consistent with the requirements of law, as may be directed by the court in its order of recall. The timing and procedure of the recall disposition hearing shall be consistent with the rules, rights, and

---

[5] As further amended by Statutes 2007, chapter 257, section 2, effective September 29, 2007, section 731(a)(4) now provides in part: "(a) If a minor is adjudged a ward of the court on the ground that he or she is a person described by Section 602, the court . . . may do any of the following: [¶] . . . [¶] (4) Commit the ward to the Department of Corrections and Rehabilitation, Division of Juvenile Facilities, if the ward has committed an offense described in subdivision (b) of Section 707 *and is not otherwise ineligible for commitment to the division under Section 733.*" (Italics added.)

procedures applicable to delinquency disposition hearings, as described in Article 17 (commencing with Section 675)." (Italics added.)

B. *Analysis*

As already discussed, in late October 2006 Carl admitted he violated probation by associating with a known gang member and possessing gang paraphernalia. The court committed him to the CYA at the contested December 2006 disposition hearing.

In his petition, Carl asserts, and the People agree, that neither of his probation violations that resulted in his CYA commitment was a section 707, subdivision (b) offense within the meaning of sections 731 and 733 (discussed, *ante*). Carl maintains that because neither of the violations was one of the offenses enumerated in section 707, subdivision (b) (hereafter section 707(b)), he could not lawfully be committed to the CYA because section 731(a)(4), as amended, does not authorize a CYA commitment, and section 733 prohibits such a commitment, in this case. He asserts that sections 731(a)(4) and 733 govern here and must be given retroactive effect. Carl quotes *People v. Rossi* (1976) 18 Cal.3d 295, 298 [134 Cal.Rptr. 64, 555 P.2d 1313], for the proposition that "[a]t common law, a statute *mitigating punishment* applied to acts committed before its effective date as long as no final judgment had been rendered." (Italics added.) Carl also quotes *In re Estrada* (1965) 63 Cal.2d 740, 748 [48 Cal.Rptr. 172, 408 P.2d 948], for the proposition that "where the amendatory statute *mitigates punishment* and there is no saving clause, the rule is that the amendment will operate retroactively so that the lighter punishment is imposed." (Italics added.)

■ Carl's assertions are unavailing. "A new or amended statute applies prospectively only, unless the Legislature clearly expresses an intent that it operate retroactively." (*People v. Ledesma* (2006) 39 Cal.4th 641, 664 [47 Cal.Rptr.3d 326, 140 P.3d 657], citing *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 287 [279 Cal.Rptr. 592, 807 P.2d 434]; see also *Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1207–1208 [246 Cal.Rptr. 629, 753 P.2d 585].)

■ Here, section 731.1 is essentially a nonretroactivity clause that applies to sections 731 and 733. As already noted, section 731.1 was enacted as part of the same legislation that became operative on September 1, 2007, and amended section 731, repealed former section 733, and added the current version of section 733. Section 731.1 provides a two-step process for addressing CYA commitments such as the one Carl is challenging, i.e., those that occurred before September 1, 2007, based on conduct that was not a section 707(b) offense. As already discussed, section 731.1 provides in part:

"Notwithstanding any other law, the court committing a ward to the Department of Corrections and Rehabilitation, Division of Juvenile Facilities, *upon the recommendation of the chief probation officer of the county*, may recall that commitment in the case of any ward whose commitment offense was not an offense listed in subdivision (b) of Section 707, unless the offense was a sex offense set forth in paragraph (3) of subdivision (d) of Section 290 of the Penal Code, and who remains confined in an institution operated by the division on or after September 1, 2007. Upon recall of the ward, *the court shall set and convene a recall disposition hearing* for the purpose of ordering an alternative disposition for the ward that is appropriate under all of the circumstances prevailing in the case." (Italics added.)

■ Thus, as pertinent here, section 731.1 provides a two-step commitment recall process under which (1) the chief probation officer for the county initiates the process by making a recommendation to the juvenile court to recall the commitment of a ward whose commitment offense was not a section 707(b) offense, and who remains in a qualifying institution on or after September 1, 2007; and (2) based upon that recommendation, the juvenile court sets and convenes a recall disposition hearing for the purpose of ordering an alternative disposition for the ward that is "appropriate under all of the circumstances prevailing in the case." (§ 731.1.) In light of the foregoing statutory recall process set forth in section 731.1, Carl's claim that he is automatically entitled to a new hearing under sections 731 and 733 is unavailing.

■ Carl's reliance on *People v. Rossi, supra*, 18 Cal.3d 295, and *In re Estrada, supra*, 63 Cal.2d 740, is also unavailing. Those cases stand for the proposition that when new legislation decreases the penalty for a crime, the lesser penalty is applicable to all convictions not yet final, unless the law specifically provides otherwise. (*Rossi, supra*, 18 Cal.3d at p. 298; *In re Estrada, supra*, 63 Cal.2d at p. 748; see also 1 Witkin & Epstein, Cal. Criminal Law, *supra*, Introduction to Crimes, § 34, p. 65 [Under *Estrada*, the question remains one of legislative intent, and a statute that lessens the punishment and expressly limits its coverage to offenses committed after its effective date will be applied prospectively].) Here, the statutes on which Carl relies—sections 731 and 733—do not address punishment or penalties for criminal offenses. Rather, they govern where a juvenile delinquent may serve time for purposes of rehabilitation. (See § 202(b), discussed, *ante*; *In re Michael D., supra*, 188 Cal.App.3d at p. 1396 [Legislature intended that the provisions of § 202(b) place greater emphasis on punishment as a *rehabilitative* tool and on restrictive commitment as a means of protecting the public safety].)

## DISPOSITION

The judgment is affirmed.

Huffman, Acting P. J., and McDonald, J., concurred.

On March 6, 2008, and March 12, 2008, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied May 21, 2008, S162099.