Filed 8/26/14  In re Ryan P. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re Ryan P., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>Ryan P.,<br><br>    Defendant and Appellant. | A140120<br><br>(Alameda County<br>Super. Ct. No. SJ09012267) |

In sustaining his fourth delinquency petition since the age of 12, the juvenile court found that 16-year-old Ryan P. fired several gunshots at a family friend.  Following a contested disposition hearing, the court committed him to the Department of Corrections and Rehabilitation, Division of Juvenile Facilities (DJF; formerly Division of Juvenile Justice).  Ryan appeals, arguing the court abused its discretion in finding he would probably benefit from the commitment and that less restrictive alternative placements were inappropriate.  We affirm.

## I.    BACKGROUND

A.    *First Petition*

In October 2008, Ryan (then age 12) chased, restrained, and then "assaulted a female peer [middle school] classmate . . . by grabbing her, licking the side of her neck, biting her on her left breast and squeezing her buttocks," leaving a visible bite mark on the victim's breast.  The incident was Ryan's 17th school disciplinary referral since

1

May 2008, and many had been sexual in nature, such as pulling down a girl's pants during gym class. The Contra Costa County District Attorney filed a wardship petition (Welf. & Inst. Code, § 602)[1] charging Ryan with sexual battery (Pen. Code, § 243.4, subd. (a)). Ryan admitted simple misdemeanor battery (Pen. Code, §§ 242, 243, subd. (a)), and the sexual battery charge was dismissed. The juvenile court declared Ryan a ward and released him to his mother's home. A licensed psychologist assessed Ryan and concluded he was not a high recidivism risk, was not a sexual predator, and did not pose a significant harm to the community. The matter was transferred to Alameda County, where Ryan had moved with his mother. In January 2010, Ryan was diagnosed with attention deficit hyperactivity disorder, oppositional defiant disorder, and anxiety.

On July 6, 2010, a notice of probation violation (§ 777) alleged that Ryan had failed to appear in court. An arrest warrant had issued, and Ryan was taken into custody after he was caught shoplifting. Ryan admitted the probation violation and was released to his mother's home with stricter conditions.

B.    *Second Petition*

In May 2011, Ryan (then age 14) robbed a teenager on the street after threatening to shoot him. Ryan became combative when officers attempted to search and arrest him. The Alameda County District Attorney filed a petition charging Ryan with robbery, possession of stolen property, and resisting arrest (Pen. Code, §§ 211, 496, 148, subd. (a)). Ryan admitted felony theft (Pen. Code, § 487, subd. (c)), and the original charges were dismissed.

In a probation evaluation, Ryan reported that he had been beaten and sexually abused by a stepgrandmother from the age of nine. A psychodiagnostic evaluation of Ryan stated, "There is little doubt that Ryan has experienced a long history of psychological and physical trauma," and his "delinquent behaviors are attributable to his mental disturbance," cognitive deficits, and emotional deprivation in his family relationships. Ryan minimized his use of marijuana and alcohol, but admitted associating

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

with gang members.  At disposition in June 2011, the court ordered Ryan placed at a group home in San Jose.

In October 2011, Ryan absconded from the group home and was arrested a week later.  A notice of probation violation issued and Ryan admitted the offense.  Ryan was accepted into a collaborative court program and referred to the family preservation unit.  In February 2012, Ryan was released from juvenile hall to his mother's care on GPS monitoring, and the monitoring condition was lifted two weeks later.

C.    *Third Petition*

In early March 2012, Ryan (then age 15) committed an armed carjacking and robbery with a companion, then fled by car, driving the wrong way on a highway, and then on foot.  The Alameda County District Attorney filed a petition charging Ryan with robbery (Pen. Code, § 211), and evading a police officer by driving on the wrong side of the highway (Veh. Code, § 2800.4).  As to the robbery count, it was alleged that Ryan personally used a deadly or dangerous weapon (a replica BB gun) (Pen. Code, § 12022, subd. (b)).  After a contested jurisdictional hearing, the juvenile court found both counts and the enhancement allegation true.  The disposition report noted that Ryan had a gang tattoo and admitted prior gang membership.  The court terminated family preservation services, and after an extended placement process, placed Ryan at a group home in Stockton (Teen Triumph), a "highly structure[d] living environment that emphasizes behavior modification" where he would participate in therapy and attend school.  The court also approved administration of psychotropic medication for impulsivity and depression, an order that was renewed and expanded the following year.  The jurisdiction and disposition orders were affirmed on appeal.  (*In re Ryan P.* (Aug. 27, 2013, A135485) [nonpub. opn.].)

In December 2012, Ryan absconded from Teen Triumph.  A notice of probation violation was filed and a warrant issued for his arrest.

D.    *Current Petition*

On January 15, 2013, Ryan fired several shots at R.W., a family friend he had known for years.  R.W. had walked past Ryan and he started shooting in her direction

3

when she reached the porch of a friend's house; she was able to enter the house unhurt. R.W. was unsure of Ryan's motive, but thought he might have been upset because she had refused to give him money a few days earlier, or he might have had a dispute with her friend's brother.[2]  The Alameda County District Attorney filed a petition charging Ryan assault with a firearm and alleging he personally used the firearm (Pen. Code, §§ 245, subd. (a)(2), 12022.5, subd. (a)).  Following a contested jurisdictional hearing, the juvenile court found the charge and allegation true.

E.     *Disposition of Current Petition*

Ryan asked the court to send him to a "strict out-of-state wilderness type program" rather than DJF.  Defense counsel confessed error in advocating for Ryan to be sent to Teen Triumph rather than a more rigorous program at the prior disposition hearing.  "I now realize . . . Ryan needed a program like ROP [(Rite of Passage)]. . . . [B]ecause Teen Triumph was relatively gentle in the delivery of its program, Ryan never actually made any genuine commitment to their program and eventually found it too easy to AWOL and return to his corrupt life in Oakland."

Defense counsel also argued that a DJF commitment would be dangerous for Ryan because he had been labeled a "snitch":  "While on the run, Ryan became a witness to a shooting and killing . . . .  As a witness and not a suspect, he helped to identify several now charged suspects.  As a result the word has gotten around that he's a 'snitch.'  I have personally confirmed that during Ryan's current stay in Juvenile Hall, he has been the victim of threats and an assault associated with being labeled a snitch.[3]  According to [Ryan's] mother, she has received a message from [DJF] inmates that they are waiting for

---

[2] Ryan did not testify at the jurisdiction hearing, but after the petition was sustained he provided the following information about the incident during the disposition proceedings.  He claimed R.W. and others had viciously attacked him—and R.W. had personally pistol whipped him—earlier on the day of the shooting because R.W. believed he had stolen something from her.  Other people then egged Ryan on to retaliate against her.  When he shot at R.W., he intended to injure her, but not to kill her.

[3] In May 2013, the court ordered Ryan transferred to a juvenile facility in another county.

4

Ryan. Given his problem criminal associations locally and the 'snitch' label [he] now has, it seems a [DJF] commitment could be problematic and dangerous. My discussions with an intake counselor at ROP[] gives me the impression they are better equipped to handle disputes between so called 'enemies' and often have great success reducing the tensions between feuding gangs and residents."

The court was also asked to consider two research papers describing serious problems at DJF and the 2013 report of a special master in litigation on DJF conditions. Defense counsel argued DJF was not appropriate for Ryan because it housed the worst of the worst, and that DJF could not offer Ryan the mental health and other services he needed.

The probation department recommended "a remote placement" and a "high level residential placement" rather than a DJF commitment. "[Ryan] has been involved in several serious incidents[,] however, does appear to be remorseful and could be successful in a placement program. Ryan has few positive influences in his life and little family support. It is believed that [he] has turned to the 'streets' and negative peers for support and due to his immature and childlike nature is easily persuaded negatively. . . . Ryan has requested he be placed in Pennsylvania as he is afraid for his safety. He claims his life is being threatened by a juvenile who is being detained in Juvenile Hall."

By the time of the disposition hearing, ROP and two other programs had rejected Ryan. ROP wrote: "The treatment team has a number of concerns with Ryan's safety. First, the MOB gang put a hit out on his life for testifying as a witness in a [BART] shooting. Second, the MOB gang shot up Ryan's mother's home. Third, Ryan said that he knows MOB gang members who are currently at ROP . . . and he would have problems with them." Clarinda Academy rejected him "due to his sexual abuse issue and not completing any sex offender treatment." George Junior Republic rejected him because of his history of aggressive, assaultive and criminal behavior, which required a more restrictive environment.

Ryan had, however, been accepted at Woodward Academy in Iowa (Woodward) and defense counsel urged the court to place him there. "This program is ideal for Ryan

5

because it offers him sex offender counseling, could address his mental and educational needs, has a more diverse minor population, and its remoteness and lack of a Bay Area population practically eliminates all safety concerns . . . ." An acceptance letter from Woodward states: "We feel our sex offender specific programming would be the most appropriate programming for him to openly deal with his past abuse as a victim and a perpetrator. He will also be able to address his past behaviors, relationship issues, and choices that have resulted in him being detained both in the past and presently."

At the disposition hearing, Ryan presented testimony by staff members from the locked juvenile hall units for high-risk offenders where he had been housed in Contra Costa and Alameda Counties. Ryan had no major behavior problems while in custody, and he participated in mental health and educational programs. However, the witnesses were not aware of Ryan's full criminal record, gang affiliation, or history of absconding from unsecured placements. Three acknowledged that juveniles who do well in the controlled environment of a locked facility might nevertheless be violent on the streets.

The defense also called Jennifer Zaballos, the probation officer who had written Ryan's disposition report, and who had supervised Ryan when he was at Teen Triumph. She recommended Woodward because it was out of state and it offered a sex offender program and mental health services. However, Zaballos appeared to be unfamiliar with Ryan's full criminal history and prior performance on probation, and she was not personally familiar with Woodward.

The deputy district attorney urged the court to commit Ryan to DJF in order to hold him accountable, to protect the public, and to rehabilitate him. She argued Ryan's long history of serious and increasingly violent offenses, as well as his history of absconding from less restrictive placements, called for a DJF commitment, and noted that Ryan had squandered an opportunity at his last disposition when the court responded to his plea not to be committed to DJF.

The juvenile court committed appellant to DJF with the following remarks: "Woodward . . . is like trying to put a square peg in a round hole. The only reason they would take Ryan for an extended program, which I believe he needs, is that he has a . . .

possible sex offense treatment issue, which really goes back many, many years, and, you know, I see Ryan not as a sex offender at this point. He's certainly much more violent and much more significant an offender than he was when he committed the . . . sex offense when he was very young. He's graduated, if you will, to robberies, to carjackings, to assaults, to use of guns and being in gangs . . . . [¶] . . . [W]e had many discussions off the record, and I was hoping to try to find a placement which I thought might make sense for him, and that one was specifically [ROP]. I thought he would do very well there. . . . I don't think Woodward . . . is anywhere close to that type of program. . . . I did as much research as I could, and . . . I thought it was a much different type of placement." The court found that Ryan's mental and physical conditions and qualifications were such that he probably would benefit from programs provided at DJF. "[H]e needs to be in a locked facility and to obtain the education that [DJF] has to offer for him . . . [including] substance abuse treatment, anger management, victims' awareness activities, specialized programs for people who are emotionally disturbed." On the reports critical of DJF, the court noted several comments in the reports about vast improvements. "Mental health . . . is the one area that was not improved yet, but there's a plan to improve it, and I think that Ryan would benefit from that plan."

Personally addressing Ryan, the court said: "You and I have been with each other for many, many times, many weeks and months, and you know I really think you can make it. I think you have it in you that you can do it, and I don't think that [DJF] is going to be as awful as maybe you might think also. We've had quite a few kids come through here who have done fine at [DJF]. They get educated. They get their G.E.D. or get their high school diplomas. They don't get in fights. They don't bang and they just do what they have to do and they get through it, and I think you're capable of that, I really do. You're darn lucky that the district attorney didn't try to file this as an adult against you because that actually was what I thought they would have done for this case, and if that were the case, you'd be, more than likely, going to prison. So do what you have to do. Take advantage of it."

The court committed Ryan to DJF for the maximum term of commitment of eight years three months, with credit for 690 days time served.

## II. DISCUSSION

The court has the authority to commit an offender in a case like Ryan's to a range of restrictive placements up to and including a DJF commitment. (§§ 727, 730, 731, 733.) In choosing an appropriate disposition, the court must consider, "in addition to other relevant and material evidence, (1) the age of the minor, (2) the circumstances and gravity of the offense committed by the minor, and (3) the minor's previous delinquent history." (§ 725.5.) The court also must be guided by the purpose of California's juvenile delinquency law, which is to "provide for the protection and safety of the public and each minor under the jurisdiction of the juvenile court and to preserve and strengthen the minor's family ties whenever possible . . . . [¶] . . . Minors . . . shall . . . receive care, treatment, and guidance that is consistent with their best interest, that holds them accountable for their behavior, and that is appropriate for their circumstances. This guidance may include punishment that is consistent with the rehabilitative objectives of this chapter. . . . [¶] . . . [¶] . . . As used in this chapter, 'punishment' means the imposition of sanctions. It does not include retribution . . . ." (§ 202, subds. (a), (b), (e); *In re Carl N.* (2008) 160 Cal.App.4th 423, 432–433.) Before the court may commit a ward to DJF, it must be "fully satisfied that the mental and physical condition and qualifications of the ward are such as to render it probable that he will be benefited by the reformatory educational discipline or other treatment provided by the [DJF[4]]." (§ 734.) There also must be evidence of "the inappropriateness or ineffectiveness of less restrictive alternatives." (*In re Angela M.* (2003) 111 Cal.App.4th 1392, 1396.)

"The decision of the juvenile court to commit a juvenile offender to [DJF] may be reversed on appeal only by a showing that the court abused its discretion. [Citation.] '[D]iscretion is abused whenever the court exceeds the bounds of reason, all of the

---

[4] On and after July 1, 2005, statutory references to the California Youth Authority are deemed to refer to the DJF. (§ 1000.)

circumstances being considered.' [Citation.] [¶] . . . '[A]n appellate court will not lightly substitute its decision for that rendered by the juvenile court. We must indulge all reasonable inferences to support the decision of the juvenile court and will not disturb its findings when there is substantial evidence to support them. [Citations.] In determining whether there was substantial evidence to support the commitment, we must examine the record presented at the disposition hearing in light of the purposes of the Juvenile Court Law.' " (*In re Carl N., supra,* 160 Cal.App.4th at pp. 431–432.)

Ryan argues there was insufficient evidence to support a finding that he would probably benefit from a commitment to DJF. First, he argues his personal safety was at risk in DJF because he had been labeled a snitch and received threats against his life. Ryan cites no evidence that DJF could not protect him from any enemies who might be in DJF, which is a statewide system with facilities in numerous counties. Ryan does not dispute that he was safe at Contra Costa County Juvenile Hall, just one county removed from the juvenile hall in Alameda County. Further, the reports Ryan cites to demonstrate violence and fear persist at DJF also includes evidence that violence and fear have decreased and a security classification system has been successfully implemented to separate youth with high risk of violent activity from those with a lower risk evidence.

Ryan asserts that DJF could not adequately address his mental health and special education needs, citing the special master's report of ongoing issues in mental health and educational programming. However, Ryan does not identify specific mental health treatment or educational programming he needs that is unavailable at DJF. The special master's report indicates that DJF operates high schools offering special education services and that, as of July 2013 (prior to Ryan's Oct. 2013 commitment), DJF had hired new mental health program leadership and established new implementation goals. With regard to Ryan's more specific argument that he would not receive adequate sex offender treatment at DJF, the special master's report indicates that DJF provides a sexual behavior treatment program. Moreover, the record does not show a compelling need for sex offender treatment in Ryan's case. Although the first of Ryan's four section 602 petitions charged a sex offense following other disciplinary referrals involving sexual

9

conduct, Ryan was in middle school at the time, the charge was reduced to simple battery and a psychologist concluded in a court-ordered assessment that Ryan was not a sexual predator. The psychologist recommended individual therapy, not specialized sex offender treatment. Ryan's more recent offenses involved firearms, theft and evading or resisting arrest. The fact that Ryan was rejected from one program because he had not undergone sex offender treatment, or the possibility he might benefit from such treatment, did not require the court to deem it an overriding consideration in the disposition calculus.

Ryan further argues there was insufficient evidence that the less restrictive alternative of Woodward was an inappropriate placement for him. The court expressed its concern, however, with the limited information Ryan provided about Woodward. The brochure provided by Ryan described Woodward as a highly-structured community residential program aimed at redirecting delinquent behavior toward more positive conduct and offered education, sex offender and substance abuse treatment. The court conducted additional research about Woodward and concluded that sending Ryan there would be "like trying to put a square peg in a round hole" in that it did not seem to provide the structure and services Ryan's increasingly violent behavior required. Ryan also had a history of absconding from nonsecure residential programs, and Woodward had accepted Ryan specifically into its sex offender program, thereby focusing treatment on an issue that evidence indicated was not Ryan's pressing need.

The juvenile court also seriously considered a less restrictive alternative to DJF commitment for Ryan and all relevant criteria and circumstances. Apparently several discussions regarding placement were held off the record with counsel and the disposition hearing was repeatedly continued, providing counsel and the probation department ample time to identify and inform the court about possible alternative placements. As the court said, "I think I've had more thought and research and feelings about this case than any other in 25 years, which is saying a lot because I've had kids who have done well and done poorly and had all kinds of issues . . . ." We will not second guess the court's judgment in this case. The court acted well within its discretion in determining that

10

Ryan's personal needs, and the protection of public safety, warranted a commitment to DJF.

### III. DISPOSITION

The disposition order is affirmed.

_____
Bruiniers, J.

We concur:

_____
Jones, P. J.

_____
Needham, J.

11