Filed 8/26/19  In re N.C. CA1/3

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re N.C., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>N.C.,<br><br>        Defendant and Appellant. | A154725<br><br>(Contra Costa County<br>Super. Ct. No. J17-01085) |

This is an appeal from the juvenile court's dispositional order committing minor N.C., born in 2000, to the Division of Juvenile Justice (DJJ) for a maximum period of confinement of nine years following his admission to one count of forcible oral copulation and one count of sexual battery. These counts stem from an incident in which N.C. and another minor, G.K., sexually abused a clearly intoxicated 17-year-old female high school student outside a private house party after a homecoming dance.

On appeal, N.C. challenges his commitment to DJJ as an abuse of the juvenile court's discretion, reasoning there is no evidence this commitment would be of probable benefit to him or that a less restrictive placement would be ineffective or inappropriate. For reasons that follow, we affirm.

1

**FACTUAL AND PROCEDURAL BACKGROUND**

On October 20, 2017, a juvenile wardship petition was filed pursuant to Welfare and Institutions Code section 602[1] alleging that minor committed the following offenses: kidnapping for sexual purposes (Pen. Code, § 209, subd. (b)(1)) (count one); rape in concert (Pen. Code, § 264.1) (count two); forcible oral copulation in concert (Pen. Code, § 288a, subd. (d)) (counts three and four); and forcible oral copulation (Pen. Code, § 288a, subd. (c)(2)) (counts five and six). In addition, as to counts two, four, and six, the petition alleged special circumstances kidnapping (Pen. Code, § 667.61, subds. (b), (e)).

This petition arose from the following events occurring at a homecoming party at a private residence on the evening of September 30, 2017.[2] The 17-year-old victim was already inebriated when she arrived outside the party after drinking alcohol with a friend. She greeted two acquaintances, minor and G.K., who were over to the side of the yard. When she approached the boys, G.K. pulled her over to a nearby bench. Feeling weak and intoxicated, she sat down. The boys then stood in front of her with their genitals exposed, each trying to force her to orally copulate him. She refused, closing her mouth and turning her head away. However, as she tried to leave and enter the house party, she fell to the ground. G.K. told her, " 'No you're not,' " and grabbed her arm, pulling her toward a nearby car, where he pushed her to her knees.

At the car, the boys again tried to force the victim to orally copulate them. Minor tried to put his penis in her mouth, but she kept her mouth shut. He admitted he exposed his penis to her and slapped her on the face with it before they got into the car, and he also admitted forcing her head toward his penis while they were in the car, in an effort to force her to orally copulate him. Minor retreated *only* when she forcibly told him, " 'No.' " G.K., however, pulled her onto his lap, pulled down her leggings and raped her despite her continuous assertions of " 'No,' " as minor " 'mostly just stood there . . . .' "

---

[1] Unless otherwise stated, all statutory citations herein are to the Welfare and Institutions Code.

[2] These facts are taken from the probation report and the hearing information sheet, as there was no contested jurisdictional hearing.

As G.K. continued his attack, she was able to make a 10-second audio recording during the incident in which she can be heard repeatedly saying, " 'No, please stop, I want to leave.' "  G.K. can also be heard, telling her, " 'No, you're not leaving.' "

The following Monday at school, the victim told a school counselor about the incident but stated that it happened to " 'a friend.' "  Two weeks later, she acknowledged to the counselor that she was the " 'friend' " involved in the incident.  The victim's friend later told investigating officers that the victim was " 'really drunk' " and that both boys took her to a car and " 'tried to have sex with her,' " but that minor left before G.K. raped her.  In a recorded pretext phone call, G.K. admitted having sex with the victim.  In subsequent police interviews, G.K. denied raping her, and minor admitted both boys tried to force her to orally copulate them (once in the side yard and once in the car).

On April 30, 2018, the petition was amended to add one felony count of sexual battery (Pen. Code, § 243.4) (count seven), and, pursuant to a negotiated disposition, minor admitted counts five and seven and the court dismissed the remaining counts.  In reaching this disposition, minor was advised that count five, forcible oral copulation, is a serious felony and a strike offense that made him eligible for commitment to DJJ and subject to sex offender registration.

In the probation report, probation officer Bailey Rodriguez concluded home supervision was not an option in light of several circumstances, including the recent arrest of minor's mother, incarceration of his father, and recent detention of his brother in juvenile hall following a probation violation.  Rodriguez recommended minor's commitment to DJJ based on, among other factors, the seriousness of his offense, his score of 6 on the JSORRAT-II test (indicating he posed a moderate risk of committing another sexual offense in the future), and the fact that DJJ offers a "seven-stage Sexual Behavioral Treatment Program [SBTP] in a therapeutic living unit devoted to the comprehensive treatment of resident sex offenders."

Following a contested disposition hearing, the juvenile court adjudged minor a ward of the court and committed him to DJJ with a maximum confinement time of nine years.  This timely appeal followed.

## DISCUSSION

On appeal, minor challenges his commitment to DJJ as an abuse of discretion. Minor reasons the evidence was insufficient to prove that he would obtain a probable benefit from this commitment, or that less restrictive alternatives would be ineffective or inappropriate in his case. As such, minor asks this court to reverse the commitment order and remand for a further disposition hearing.

We review the juvenile court's commitment decision for abuse of discretion, indulging all reasonable inferences to support its decision. (*In re Angela M.* (2003) 111 Cal.App.4th 1392, 1396.) " ' " 'In determining whether there was substantial evidence to support the commitment, we must examine the record presented at the disposition hearing in light of the purposes of the Juvenile Court Law.' " ' [Citation.] The general purpose of the law, which encompasses both dependency and delinquency proceedings, is described in section 202, subdivision (a), which states that 'The purpose of this chapter is to provide for the protection and safety of the public and each minor under the jurisdiction of the juvenile court and to preserve and strengthen the minor's family ties whenever possible, removing the minor from the custody of his or her parents only when necessary for his or her welfare or for the safety and protection of the public. If removal of a minor is determined by the juvenile court to be necessary, reunification of the minor with his or her family shall be a primary objective. If the minor is removed from his or her own family, it is the purpose of this chapter to secure for the minor custody, care, and discipline as nearly as possible equivalent to that which should have been given by his or her parents. This chapter shall be liberally construed to carry out these purposes.' " (*In re Carlos J.* (2018) 22 Cal.App.5th 1, 5.)

Because rehabilitation is one of the primary objectives of juvenile court law, our statutory scheme " 'contemplates a progressively more restrictive and punitive series of dispositions starting with home placement under supervision, and progressing to foster home placement, placement in a local treatment facility, and finally placement at the

[DJF]. [Citation.]' "[3] (*In re Carlos J.*, *supra*, 22 Cal.App.5th at pp. 5–6.) At the same time, another primary objective of juvenile court law is to protect public safety. As such, there is no absolute rule that a DJJ commitment must be reserved as a last resort placement and cannot be ordered unless less restrictive placements have been attempted where, in a particular case, a DJJ commitment is deemed necessary to protect the public safety. (*Ibid.*; accord, *In re Carl N.* (2008) 160 Cal.App.4th 423, 433.) However, "to ensure the necessity of a DJF placement, there must be evidence 'supporting a determination that less restrictive alternatives are ineffective or inappropriate.' [Citation.] More importantly in the present case, 'there must be [substantial] evidence in the record demonstrating . . . a probable benefit to the minor by a [DJF] commitment . . . .' (*In re Angela M*.[, *supra*,] 111 Cal.App.4th [at p.] 1396 [citation]; [citations].) That is because section 734 provides that 'No ward of the juvenile court shall be committed to the [DJF] unless the judge of the court is fully satisfied that the mental and physical condition and qualifications of the ward are such as to render it probable that he will be benefited by the reformatory educational discipline or other treatment provided by the [DJF].' " (*In re Carlos J.*, *supra*, at p. 6.) " ' "[A] trial court abuses its discretion when the factual findings critical to its decision find no support in the evidence." ' " (*In re Nicole H*. (2016) 244 Cal.App.4th 1150, 1154.)

Here, minor contends the juvenile court abused its discretion by committing him to DJJ because the record does not contain sufficient evidence that this commitment would provide him a probable benefit or that one of the proposed less restrictive alternative programs would be ineffective or inappropriate. Minor also contends the commitment order is based on the juvenile court's mistaken assumption that, if he is placed in one of the less restrictive programs, he will not have enough time before aging

---

[3] DJJ is also known as the Department of Corrections and Rehabilitation, Division of Juvenile Facilities (DJF). DJJ/DJF is the current name of the former California Youth Authority. (See *In re Joseph H.* (2015) 237 Cal.App.4th 517, 541, fn. 13.) The terms DJJ and DJF are used interchangeably in the case law.

5

out of the program to complete a sexual abuse treatment program (which, according to the court, would take at least 18 months).

Having reviewed the record at hand while indulging all reasonable inferences in favor of the juvenile court's order (*In re Angela M*., *supra*, 111 Cal.App.4th at p. 1396), we reject minor's arguments. For reasons set forth in full below, we find credible, substantial evidence supporting the juvenile court's findings of a probable benefit to minor from a DJJ commitment and of the inappropriateness or ineffectiveness of the proposed less restrictive alternatives. (See *In re Jonathan T*. (2008) 166 Cal.App.4th 474, 484–485.)

### A.     Probable Benefit to Minor.

First, with respect to the probable benefit to minor of a DJJ commitment, Bailey Rodriguez, his probation officer, recommended the DJJ's SBTP, which offers a separate therapeutic living unit devoted to the comprehensive treatment of resident juvenile sex offenders. In particular, she described this program as involving a comprehensive mix of "individual and group therapy, psycho-educational resource groups, journals and homework, group therapeutic exercises, biblio-therapy, video therapy, family counseling, family forums, plant and pet care, and therapeutic recreation and leisure activities."

In addition, Dr. Hunter, senior psychologist supervisor at DJJ, testified that SBTP was appropriate for first time offenders like minor, as the curriculum is based on empirical evidence and research regarding "what has been found to be efficacious for juveniles based on their developing brain[s]." Dr. Hunter explained that the participants are expected to address their committing offenses, as well as their own personal trauma and criminal thinking, such that "treatment is not just addressing and processing the committing offense[;] it's a much bigger, more . . . holistic picture that we want this youth to go out and be successful in all areas of their [*sic*]life." Dr. Hunter added that SBTP participants are also expected to attend school with the aim of earning a diploma or GED, and are given various opportunities for vocational training.

Even minor's expert, Dr. Norbert Ralph, an undisputed expert on sexual offending youth, described SBTP as "a rigorous, well thought-out program" when recommending

minor be placed at a "comparable structured residential or outpatient program[] . . . ." In fact, Dr. Hunter had trained with Dr. Ralph and testified that Dr. Ralph was very involved with DJJ.

Notwithstanding this substantial evidence regarding the benefits offered to SBTP participants, minor points out that multiple witnesses, including social worker Arthur Paull and expert Debra Mendoza, opined that DJJ commitment would *not* be beneficial to him when compared to a structured residential or outpatient program, and may actually be disruptive of his growth and development given there is "more of a criminal element" at DJJ. Minor further notes that Dr. Ralph assigned him a score of 5 on the JSORRAT-II test and found that he was not a risk to public safety. Based on these facts, Dr. Ralph opined there was "not a clear rationale for placement of [minor] in a secure, youth prison setting from a public safety point of view."

While we acknowledge this conflicting evidence, it does not render the juvenile court's commitment order an abuse of discretion or warrant its reversal. As stated above, our role on appeal is to determine whether the juvenile court's order is reasonably grounded in the record, not to reweigh the evidence in the record. (See *In re Alejandro G.* (2012) 205 Cal.App.4th 472, 480 [juvenile court has no obligation to adopt an expert's opinion, and the fact that multiple experts had a different opinion than the court does not prove a lack of substantial evidence to support the court's ultimate finding].) We also accept the juvenile court's credibility determinations for purposes of appeal, and, here, the court found that Paull's testimony "lacked foundation" and was "clearly biased," after directly questioning Paull regarding whether his organization, A Step Forward, would benefit financially were minor placed there.[4] We decline to substitute our judgment for the juvenile court's on this issue. (See *In re Juan G.* (2003)

---

[4] One concern the juvenile court appears to have had with Paull's testimony was Paull's lack of directness when asked if the court had correctly been informed that, in the near future, A Step Forward was going to stop accepting Medi-Cal payment and patients covered by Medi-Cal, such that it would then be up to minor's family to pay for his treatment.

112 Cal.App.4th 1, 6 ["The function of an appellate court is not to reweigh the evidence and substitute its judgment for that of the juvenile court"].) The court's finding of a probable benefit thus stands.

**B.    Inappropriateness or Ineffectiveness of Less Restrictive Programs.**

Lastly, we turn to minor's contention that the commitment order was an abuse of the juvenile court's discretion because there was no evidence his proposed less restrictive programs are inappropriate or would be ineffective. Having reviewed the record while indulging all inferences to support the juvenile court's order (*In re Angela M.*, *supra*, 111 Cal.App.4th at p. 1396), we again find no abuse of discretion.

In fact, the record reflects the juvenile court considered placing minor in several alternative programs, including A Step Forward, Children's Home of Stockton and Oakendell, Youth Offender Treatment Program (YOTP), and Boys Ranch, before deciding he required the more restrictive setting offered by DJJ.[5] In doing so, the court relied on several factors that it stated on the record. First and foremost, the court relied upon "the gravity of this offense, the manner in which it was committed and concerns about protection for the community."

In addition, the court relied on minor's need for "intensive sexual offender treatment," which, "at the very minimum takes approximately 18 months if someone sails through . . . ." DJJ's sex offender program was designed to last 18 to 24 months, with flexibility to let a minor proceed at his or her individual pace. Thus, while acknowledging that Children's Home of Stockton and Oakendell were "excellent programs," the court rejected them in minor's case because "there's simply not sufficient time for that [type of treatment] to occur, nor am I convinced that it's an appropriate setting given the severity of this offense." As the court explained, "young people cannot be [at Children's Home of Stockton] past the age of 18 if they have a high school

---

[5] Rodriguez testified at length at the disposition hearing regarding the probation department's screening of these various alternative programs and ultimate recommendation to the court that minor be committed to DJJ.

diploma. If they do not have a high school diploma, they cannot be there past age 19. They age out. It is illegal to house somebody there beyond that."

According to minor, the court's reliance on this factor is misplaced because there is no evidence in the record that, to be effective, a sexual offender treatment program must last at least 18 months. Minor's argument misses the point. Reasonably construed, the record reflects the court was concerned that minor have sufficient time—whether he "sails through" or takes his time—to complete the necessary treatment program. This accords with Dr. Hunter's testimony. Specifically, Dr. Hunter explained SBTP has a seven-stage curriculum with each stage designed to build upon the prior stage. According to Dr. Hunter, "it can be extremely intense and sometimes it can take a youth quite a while to get through specific assignments." Thus, while the program is designed to be completed within about 18 to 24 months, each participant is able to proceed at his or her own rate depending on "what the [*sic*] resources the youth has coming in" and what "specific issues" the youth needs to address, including, for example, mental health, trauma or gang-related issues. Based on this record, the court was appropriately concerned that the proposed alternative programs, including A Step Forward and Children's Home of Stockton and Oakendell, had a strict "age out" rule by 18 or 19, which DJJ does not have, a significant issue given that minor was 17 at the time of the hearing. We decline to second-guess the court's judgment in this regard.

Finally, with respect to YOTP and Boys Ranch, the court rejected them out of hand because they did not offer what minor needs for rehabilitation—a treatment program designed for sexual offenders. Minor does not challenge this finding.

As this collection of evidence demonstrates, the juvenile court properly considered the proposed less restrictive alternatives before finding them inappropriate or ineffective in his case. In reaching this decision, the court was appropriately focused on minor's individual circumstances in light of the potential reformative, educational, rehabilitative, treatment and disciplinary benefits that a DJJ commitment, as opposed to one of the alternative programs, would provide him. (See *In re Gerardo B*. (1989) 207 Cal.App.3d 1252, 1258.) The court's inquiry also appropriately included the need to protect public

9

safety and the role punishment should have in minor's rehabilitation given the seriousness of his offense and his tendency to succumb to the negative influences of peers.  (§ 202, subd. (b); see *In re Charles C*. (1991) 232 Cal.App.3d 952, 960.)  The juvenile court's order was therefore not an abuse of discretion.

## DISPOSITION

The dispositional order committing minor to the Division of Juvenile Justice for a maximum term of confinement of nine years is affirmed.

_____

Wick, J.[*]

WE CONCUR:


_____

Siggins, P. J.


_____

Petrou, J.


A154725/*In re N.C.*

---

[*] Judge of the Superior Court of Sonoma County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

<u>A154725/In re N.C.</u>

Trial Court:    Superior Court of Contra Costa County

Trial Judge:    Rebecca C. Hardie, J.

Counsel:      Jeffrey A. Glick for Defendant and Appellant.

                Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Donna M. Provenzano and Christina vom Saal, Deputy Attorneys General, for Plaintiff and Respondent.