Filed 11/10/14  In re B.G. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re B.G., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>B.G.,<br><br>        Defendant and Appellant. | A139351<br><br>(Alameda County<br>Super. Ct. No. SJ11017577) |

While B.G. was on probation after being declared a ward of the court, subsequent to a Welfare and Institutions Code section 602, subdivision (a) petition, the People filed a second petition, alleging that B.G. had committed a series of attempted and accomplished sexual crimes, assaults and robberies.  Pursuant to a plea bargain, B.G. admitted a charge of forced sexual penetration and a charge of robbery.  In return, the People dismissed the remaining charges, with facts and restitution open, and dropped their motion that B.G. be tried as an adult.

At the disposition hearing, the juvenile court committed B.G. to the Department of Juvenile Justice (DJJ).  On appeal, B.G. argues that (1) the court erred in committing him to the DJJ because there was insufficient evidence that he would benefit from the commitment and that less restrictive options would be ineffective or inappropriate; (2) the court erred by failing to specify whether the robbery count that he admitted was of the

1

first or second degree; and (3) the court wrongly calculated the custody credits that he should receive.

We affirm the juvenile court's order committing B.G. to the DJJ because it was supported by substantial evidence. We agree with B.G. that the court should have specified the degree of the robbery count that he admitted, but by operation of law that count is deemed to be of the second degree and we need take no action. Finally, because the People provide additional reasons to believe that the custody credits communicated to the DJJ are in error, we remand to the juvenile court for a correct calculation of credits.

## BACKGROUND

B.G. first appeared before the juvenile court at the age of 14 when, on September 7, 2011, the People filed a Welfare and Institutions Code section 602, subdivision (a) petition charging him with two felonies: robbery (Pen. Code, § 211)[1] and receiving stolen property (§ 496). According to the police report, B.G. and a co-responsible followed a man as he got off a bus in Oakland on September 2, 2011. B.G. kicked the man's leg and the man fell to the ground. B.G. held his hand inside his backpack, as if he held a gun, and told the man, "give me all your money or I'll shoot you." The man took a perfume bottle from his pocket and handed it to B.G.'s companion. B.G. and his companion fled when a police car stopped at the scene. The companion was detained immediately but B.G. was able to dispose of his backpack before he was detained. The man identified B.G. and his companion as the assailants.

At the jurisdictional hearing on September 26, 2011, the court amended count 1 to allege grand theft (§ 487, subd. (c)) instead of robbery, and B.G. admitted that count. Count 2 was dismissed. At the disposition hearing on October 11, 2011, the court adjudged B.G. a ward of the court, ordered him into the care and custody of the probation department, and ordered that he reside in the home of his mother on GPS monitoring. The order for GPS monitoring was vacated on December 16, 2011.

---

[1] Further statutory citations are to the Penal Code unless indicated otherwise.

2

The People filed a second Welfare and Institutions Code section 602, subdivision (a) petition on January 18, 2012. The petition charged B.G. with four counts: (1) kidnapping to commit sexual assault and forced digital penetration (§ 209, subd. (b)(1)); (2) forced sexual penetration (§ 289, subd. (a)(1)(A)); (3) and (4) robbery (§ 211). The charges related to a January 12, 2012 incident in which B.G. approached two female victims, demanded their purses, and said he had a gun. B.G. held his hand in his pocket as if he were holding a gun. He took one purse, the other victim handed over her purse, and B.G. took $40 from the purses and put them on the ground. He then told one victim that he wanted to see her breasts and the victim, afraid, raised her shirt. B.G. then said that he wanted to see the victim's vagina and the victim dropped her pants and panties. He ordered the victim to walk over to him, and he placed his fingers inside her vagina as he kissed her face. B.G. dropped to his knees as if to perform oral sex, but fled the scene when he noticed that the other victim was no longer present. The next day, the victims identified B.G. in a photo lineup.

On January 18, 2012, pursuant to Welfare and Institutions Code section 707, subdivision (c), the People moved for the court to order the probation department to investigate and submit a report so that the court could determine B.G.'s fitness for juvenile court treatment. The People requested a finding that B.G. was unfit.

On January 24, 2012, the People amended the petition to add counts 5 through 11: (5) kidnapping to commit robbery and forced digital penetration (§ 209, subd. (b)(1)); (6) robbery (§ 211); (7) assault with attempt to commit rape, sodomy, oral copulation, and a violation of section 289 (§ 220, subd. (a)(1)); (8) assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)), accompanied by the allegation that B.G. personally inflicted great bodily injury (§ 12022.7); (9) attempted robbery (§ 664/211); (10) attempt to kidnap to commit robbery, rape, and a violation of section 289 (§ 664/209, subd. (b)(1)); and (11) robbery (§ 211).

Counts 5 through 7 relate to a January 6, 2012 incident. B.G. approached the female victim from the rear as she was walking her dog. B.G. asked for her wallet, and the victim gave it to him. B.G. then told her to walk with him. The victim complied out

3

of fear, and B.G. took her to a dark parking lot.  B.G. told her to take off her shirt and bra and she complied.  He squeezed the victim's breasts several times and tried, unsuccessfully, to put his hand down her pants.  B.G. pushed the victim to the ground after she attempted to run and kicked her several times.  The victim regained her feet and ran home, yelling for her roommate.  She identified B.G. in a photo lineup.

Counts 8 and 9 relate to a January 5, 2012 incident.  B.G. encountered the female victim as she walked home, and he accused her of being a racist.  B.G. punched her once in the nose and fled.  The victim fell to the ground, bleeding.  Her nose appeared to a police officer to be broken.  She identified B.G. in a photo lineup.

Counts 10 and 11 relate to a January 11, 2012 incident.  B.G. encountered the female victim as she walked home from work, talking on her cell phone.  B.G. questioned her about her work and phone, asked to see the phone, and the victim handed it over because B.G. had his hand in his pocket, as if he had a weapon.  B.G. told her not to flag down the police if they came by and said, "I will kill you.  I don't care."  B.G. told her to walk over to a dark area, but she refused.  B.G. searched her book bag, but was not interested in its contents.  B.G. eventually allowed the victim to leave.  The victim identified B.G. in a photo lineup.

On January 31, 2012, the People further amended the petition to add counts 12 and 13, both alleging that B.G. had committed robbery (§ 211).

Count 12 relates to a January 11, 2012 incident.  B.G. encountered the female victim as she walked down the street, and he asked for the time.  The victim ignored B.G., and he grabbed her purse and said, "If you don't tell me the time I am going to shoot you."  The victim was afraid and gave her purse to B.G., who removed $60 and fled.  The victim identified B.G. in a photo lineup.

Count 13 relates to a second January 12, 2012 incident.  B.G. encountered the female victim as she was riding a bicycle.  He deliberately blocked her way as she attempted to avoid him.  B.G. pushed the victim to the ground and told her, "Give me the bag before I shoot you."  He repeated this several times and slapped the victim in the

4

face.  B.G. then took the victim's bicycle and fled.  The victim identified B.G. in a photo lineup.

B.G. turned himself in to juvenile hall on January 17, 2012.  He admitted to the probation department that he had committed some of the charged offenses, but denied the sexual assaults.

On April 26, 2012, the probation department submitted a report recommending that the court find B.G. unfit for juvenile court treatment.

On October 5, 2012, B.G. admitted counts 2 and 6 and the remaining counts were dismissed with facts and restitution open.[2]  The People withdrew their section 707, subdivision (c) motion.  The court ordered a combined guidance clinic and mental health evaluation.  The evaluation was submitted to the court on December 18, 2012.  The evaluating psychologist, Dr. Jeremy Atkins, recommended that B.G. be placed in "a residential setting (group home) that contains a sex offender treatment program." (Bolding omitted.)

On June 26, 2013, the probation department submitted a memorandum recommending that B.G. be committed to the custody of the DJJ.  At a contested disposition hearing on June 28, 2013, the court continued B.G. as a ward of the court and committed him to the DJJ.  The court found that B.G. would benefit from a commitment to the DJJ because of "the reformatory education, discipline, and treatment programs" and that the less restrictive alternatives were not appropriate.

B.G. timely filed a notice of appeal on July 25, 2013.

## DISCUSSION

### I.  The DJJ Commitment

A trial court's decision to commit a minor to the DJJ will be reversed only if the trial court abused its discretion.  (*In re Jose T.* (2010) 191 Cal.App.4th 1142, 1147.)  A reviewing court must indulge all reasonable inferences in favor of the decision and affirm

---

[2]  B.G. reaffirmed his admissions on February 8, 2013, after being informed that he could be committed to the DJJ and that, if so, he would have to register as a sex offender for life.

5

the decision if supported by substantial evidence. (*In re Robert H.* (2002) 96 Cal.App.4th 1317, 1330.) For evidence to be substantial, it "must be reasonable in nature, credible, and of solid value." (*Joaquin v. City of Los Angeles* (2012) 202 Cal.App.4th 1207, 1219.) In determining whether substantial evidence exists, a reviewing court examines "the record presented at the disposition hearing in light of the purposes of the Juvenile Court Law." (*In re Michael D.* (1987) 188 Cal.App.3d 1392, 1395; see also Welf. & Inst. Code, § 202.)

Since 1984, the Welfare and Institutions Code has required that courts commit minors "in conformity with the interests of public safety and protection, [to] receive care, treatment, and guidance that is consistent with their best interest, that holds them accountable for their behavior, and that is appropriate for their circumstances." (Welf. & Inst. Code, § 202, subd. (b); *In re Michael D.*, *supra*, 188 Cal.App.3d at p. 1396.) " '[T]he Legislature intended to place greater emphasis on punishment for rehabilitative purposes and on a restrictive commitment as a means of protecting the public safety.' [Citation.]" (*In re Carl N.* (2008) 160 Cal.App.4th 423, 433.) Nevertheless, "the Legislature has not abandoned the traditional purpose of rehabilitation for juvenile offenders." (*In re Julian R.* (2009) 47 Cal.4th 487, 496.) "[W]hile there has been a slight shift in emphasis, rehabilitation continues to be an important objective of the juvenile court law. To support a [DJJ] commitment, it is required that there be evidence in the record demonstrating probable benefit to the minor, and evidence supporting a determination that less restrictive alternatives are ineffective or inappropriate." (*In re Teofilio A.* (1989) 210 Cal.App.3d 571, 576; accord, *In re Angela M.* (2003) 111 Cal.App.4th 1392, 1396; see also Welf. & Inst. Code, § 734 [requiring probability of benefit to the minor before commitment to the Youth Authority (now DJJ)].) In determining the appropriate disposition for the minor, the trial court is required to consider "(1) the age of the minor, (2) the circumstances and gravity of the offense committed by the minor, and (3) the minor's previous delinquent history." (Welf. & Inst. Code, § 725.5.)

B.G. argues that the court "focused almost exclusively on ensuring that [he] be locked up, and thus selected the [DJJ], despite the fact that [the] psychologist's report emphatically stated that the [DJJ] facility would be detrimental to [his] rehabilitation and recovery. Thus, the evidence was insufficient to establish that the purposes of the juvenile delinquency law would be met by a [*sic*] committing [him] to [the DJJ]. In fact, the evidence considered by the juvenile court at the disposition hearing was overwhelmingly in favor of placing [him] at Woodward . . . where the complex of interests present in a dispositional order would be satisfied." This argument amounts to a mere assertion that the court gave undue weight to a need to protect the public from potential future crimes by B.G. and insufficient weight to Dr. Atkins's report. "[I]t is not now within our province to reweigh the evidence or resolve conflicts therein in favor of the minor." (*In re Gary G.* (1981) 115 Cal.App.3d 629, 635.)

The juvenile court made both of the requisite findings—that B.G. would probably benefit from commitment to the DJJ and that less restrictive alternatives would be ineffective or inappropriate. B.G. challenges the sufficiency of the evidence for both findings, which we examine separately. We conclude that the court's order committing B.G. to the DJJ was supported by substantial evidence.

**A.** *Probable Benefit to B.G. from Commitment to the DJJ*

Dr. Atkins's report stated: "[B.G.] is not a suitable candidate for DJJ. He has not been afforded an opportunity to receive treatment in a less restrictive setting. Due to his immaturity and small physical stature he would be at risk of being targeted and further victimized. The intense anxiety that [B.G.] experienced at the [Alameda County Juvenile Justice Center] resulted in several months of painful headaches and stomach ulcers. It is likely that a DJJ commitment would lead to further debilitating anxiety-based ailments." Based on this passage from the report, B.G. maintains that there was insufficient evidence to support a finding that a commitment to the DJJ would be of probable benefit to him.

However, the probation department's June 28, 2013 memorandum listed a number of benefits that the DJJ would provide to B.G., including mental health services, comprehensive sex offender treatment, education, and vocational training. B.G. concedes

7

that the DJJ offers "the essential rehabilitative tools recommended by the Guidance Clinic and the Probation Department," but argues that "on the whole, a commitment to the [DJJ] would likely be to [his] detriment as he has a good chance of suffering severe physical and psychological harm in the institutional environment provided by the [DJJ]." B.G.'s argument invites us to reweigh the evidence, which is not our province. The probation department memorandum provides substantial evidence that B.G. would benefit from a commitment to the DJJ. Dr. Atkins's report indicated some potential detriment to B.G. from a commitment to the DJJ, but it was the province of the trial court, not of this court, to determine the weight to give that evidence.

**B.** *Less Restrictive Alternatives*

In B.G.'s case the juvenile court and the probation department went to great lengths to determine whether an effective and appropriate program, short of commitment to the DJJ, could be found.

On January 16, 2013, the probation department submitted a report to the court recommending that B.G. be committed to the DJJ. At a hearing on January 18, 2013, the court noted that the report failed to describe less restrictive placement options and why the probation department considered them to be inappropriate. Disposition was continued for an updated report.

The probation department submitted an updated disposition report on April 23, 2013. Eleven programs had screened B.G.'s case and two would accept him. One was Unicorn Ranch Group Home (Unicorn), "an unsecure residential placement" near Ukiah, California. The other was Woodward Academy (Woodward), located in Woodward, Iowa. The probation department recommended the latter as the placement of choice: "Considering the minor['s] age, lack of probation history, and the remote location of Woodward . . . , the minor would be in an environment where he can rehabilitate. He will be in a location that is far away from the location where he preyed on the victims. He will also be provided rehabilitative services that will assist him with transitioning back into the community." The report also provided details of programs that had either not accepted B.G. or had been ruled out as inappropriate for other reasons.

At a hearing on April 26, 2013, the court reviewed the placement alternatives. Because Unicorn was an unsecured residential placement, the court ruled it out as an alternative because "it's not nearly the kind of secured facility that [B.G.] would require." The court then considered Woodward as a potential alternative: "It's described as a level 14. There had been an indication that it's a lock-down facility, which I believe the minor does require, given the dangerousness of the offenses." However the probation department had informed the court that a recent contact with Woodward "indicated that it's a staffed secured . . . facility." Because the probation department did not know what that meant, further investigation was required, so the matter of disposition was again put over.

A probation department memorandum to the court was filed on June 26, 2013. A probation supervisor had visited Woodward and stated that it is located in a remote area, not near to schools, churches, or residential communities. However, it is not a locked facility and is described as being "staff secure" as a "hands-on facility." "Hand[s]-on indicates the staff will physically restrain residents in order to control their behavior and/or stop them from absconding."

The memorandum stated that the "pros" of Woodward are access to mental health services, sex offender's treatment, education, and vocational training. The "cons" are "the minimal length of time the minor will spend rehabilitating and it is not a locked / secure facility and it is out of state." The memorandum noted that the Woodward program is only 9 to 24 months in length but that the DJJ had indicated that B.G. would have a baseline discharge date of four years before he might be paroled, were he committed to the DJJ. It also noted that because Woodward is not in California, it would be more difficult for B.G.'s family to participate in the reunification process. The probation department recommended that B.G. be committed to the DJJ.

In finding that Woodward was not an appropriate placement, the juvenile court relied on the probation department report that it is not a locked facility. A juvenile court is explicitly permitted to consider the interests of public safety in determining a disposition for a minor. (Welf. & Inst. Code, § 202, subd. (b).) Here, B.J.'s offenses,

9

involving sexual predation, were especially grave. Dr. Atkins's report indicated that, by an assessment tool he used, B.G. presented a moderate to high risk of re-offense. This constitutes substantial evidence that in the interest of public safety and for the rehabilitative purpose of preventing re-offense by B.G., only a secure, locked facility would be appropriate. Despite lengthy efforts by the probation department, no secure, locked program could be found that would accept B.G.

In addition to evidence about Woodward's security arrangements, other evidence supported a finding that Woodward would be ineffective or inappropriate. The probation report noted that because Woodward is out of state, B.G.'s family would not be able to participate in the rehabilitative programs provided to B.G., while family participation in DJJ programs would be less difficult. Moreover, the program at Woodward would last only 9 to 24 months, but B.G. would likely receive at least four years of treatment at DJJ.

Ample evidence supported the juvenile court's finding that less restrictive alternatives would be ineffective or inappropriate.

## II. Degree of the Robbery Offense

B.G. contends that the juvenile court failed to perform its duty to fix the charge of robbery that he admitted at either the first or second degree. He asks us to deem the robbery to be of the second degree. We conclude that no action on our part is necessary because the robbery is deemed to be of the second degree by operation of law.

Section 1192 provides: "Upon a plea of guilty, or upon conviction by the court without a jury, of a crime or attempted crime distinguished or divided into degrees, the court must, before passing sentence, determine the degree. Upon the failure of the court to so determine, the degree of the crime or attempted crime of which the defendant is guilty, shall be deemed to be of the lesser degree." This provision has been held applicable to juvenile proceedings. (*In re C.R.* (2008) 168 Cal.App.4th 1387, 1390-1391.) The requirement of section 1192 "may be satisfied in two ways: (1) by a finding that specifically refers to the degree of the crime by its statutory numerical designation; and (2) by findings that encompass the statutory factual predicates of the degree of the crime." (*In re C.R.* at p. 1391.)

California Rules of Court, rule 5.778(f)(9) requires the juvenile court to make findings on "the degree of the offense."

B.G. admitted that he committed a robbery—"the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) If the robbery is of an operator or passenger of a commercial vehicle or of a person using an automated teller machine, the robbery is of the first degree. (§ 212.5, subds. (a), (b).) Otherwise, the robbery is of the second degree. (§ 212.5 subd. (c).)

In B.G.'s case, the juvenile court nowhere specified the degree of the robbery that B.G. admitted. He argues: "If [California Rules of Court,] rule 5.778 and the degree-fixing statute are to have meaning, the court must fulfill its obligation to fix the degree of the offense, and upon its failure to do so, the offense must be deemed to be of the lesser degree. Accordingly, this court should find that the offense should be deemed a second-degree robbery."

The People argue that "no exercise of discretion regarding degree was required because the evidence established that the crime in count 6 could only have been in the second degree."

B.G. responds that he is potentially prejudiced by the court's failure to set the degree of the robbery: "[I]t was nonetheless important that the juvenile court make such a finding and have this placed in the record. This would ensure that listing of [B.G.'s] 'felony robbery' offense in future probation reports, would not be misconstrued as first-degree robbery. Such a misreading could result in a miscalculation of [B.G.'s] maximum confinement time—as second-degree robbery carries a maximum sentence of five years and first degree robbery carries a maximum sentence of six or nine years."

We observe that, contrary to the People's assertion that "no exercise of discretion" was required, California Rules of Court, rule 5.778(f)(9) *requires* the juvenile court to specify the degree of the offense. The court erred in not meeting that requirement. However, B.G. was not prejudiced by the court's omission because, as he concedes, the court's calculation of his maximum confinement time was consistent with a

11

determination that the robbery was of the second degree.  Speculation that the probation department, the district attorney, or the court may commit an error in the future does not establish prejudice.

Although the juvenile court should have specified the degree of the robbery, there is no need for us to take any action.  Because the court failed to specify the degree, the robbery is automatically deemed to be of the second degree by operation of section 1192.

## III.  Credit for Time in Custody

When the juvenile court committed B.G. to the DJJ on June 28, 2013, it credited him with 529 days against his maximum confinement time.  B.G. contends that he should have been credited with 569 days, because the 40 days he spent in custody on his initial Welfare and Institutions Code section 602, subdivision (a) petition were not counted.  The People contend that under section 1237.1 this issue is not ripe for review because it was not first raised in the juvenile court.

Section 1237.1 provides:  "No appeal shall be taken by the defendant from a judgment of conviction on the ground of an error in the calculation of presentence custody credits, unless the defendant first presents the claim in the trial court at the time of sentencing, or if the error is not discovered until after sentencing, the defendant first makes a motion for correction of the record in the trial court."  It has been held that section 1237.1 "does not require defense counsel to file [a] motion to correct a presentence award of credits in order to raise that question on appeal when other issues are litigated on appeal." (*People v. Acosta* (1996) 48 Cal.App.4th 411, 427; accord, *People v. Jones* (2000) 82 Cal.App.4th 485, 493.)  Moreover, section 1237.1 does not apply to juvenile proceedings.  (*In re Antwon R.* (2001) 87 Cal.App.4th 348, 352.)  Accordingly, we reject the People's contention that the issue of predisposition custody credit is not ripe for review.

However, the People note that the custody credit may be wrongly calculated for another reason:  "At a placement review hearing on October 8, 2013, the record states that [B.G.] had earned credit for time served of 634 days.  [Citation.]  He was not transferred to [DJJ] until November 25, i.e., 48 days later.  [Citation.]  However, no final

12

credits calculation appears in the record." Because both B.G. and the People identify reasons to believe that B.G.'s custody credits have not been correctly calculated and communicated to the DJJ, we agree with the People that the juvenile court is in the best position to resolve the issue and we remand for that purpose.

## DISPOSITION

The juvenile court's commitment order, to the extent that it fails to correctly calculate B.G.'s pre-commitment custody credit, is reversed; in all other respects, it is affirmed. The matter is remanded to the juvenile court with directions: (1) to calculate the amount of pre-commitment custody credit to which B.G. is entitled; (2) to prepare an amended commitment order reflecting such credit; and (3) to forward a certified copy of the amended commitment order to the DJJ.

_____

STEWART, J.

We concur.

_____

KLINE, P.J.

_____

RICHMAN, J.