Filed 9/30/21

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re Miguel C., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, | D078013 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. J242744) |
| MIGUEL C., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Richard R. Monroy, Judge.  Reversed with directions.

Christine M. Aros, under appointment by the Court of Appeal, for Objector and Appellant.

Matthew Rodriquez, Acting Attorney General, Lance E. Winters and Julie L. Garland, Assistant Attorneys General, Charles C. Ragland and Scott C. Taylor, Deputy Attorneys General, for Petitioner and Respondent.

Before committing a minor to the Division of Juvenile Justice (DJJ), the state's most restrictive placement for its most severe juvenile offenders, the law requires the juvenile court to find both that the placement would probably benefit the minor, and that less restrictive options would be either ineffective or inappropriate. *In re Carlos J.* (2018) 22 Cal.App.5th 1 (*Carlos J.*) reversed a DJJ placement for a minor with no significant criminal record because the only evidence offered by the People, a probation department study that lacked even cursory information about DJJ programs, was not enough to sustain the commitment decision. In this case, we address an issue anticipated, but not decided, in *Carlos J.*—namely, what constitutes substantial evidence to support a DJJ commitment when the minor has submitted reliable evidence that such a placement would undermine the minor's specific rehabilitative needs, and where the minor's own history does not demonstrate that less restrictive options would not work?

We conclude that where a minor presents evidence suggesting that a DJJ placement would be harmful for reasons specific to the minor, the People must provide some contrary evidence that would enable the juvenile court to make a comparative analysis of the placement options *before* it concludes the minor will probably benefit from DJJ, and that less restrictive options would be ineffective or inappropriate. Here, expert testimony indicated that placing this minor in DJJ would be counterproductive because it would likely assure his entrenchment in gang culture and, due to the ready availability of drugs in DJJ facilities, undermine efforts to treat and improve a significant substance abuse disorder that led to a single episode of violent criminal behavior over the course of a few hours. Beyond identifying that substance abuse treatment was available at DJJ, the People introduced no responsive evidence. So, as in *Carlos J.*, we reverse and remand in an opinion that

2

focuses not on the substantive correctness of the juvenile court's conclusion, but on the procedural requirement that there be evidence in the record to support whatever conclusion the court reaches. On remand, given intervening changes to the juvenile court law, the trial court must first make a threshold finding as to whether juvenile justice realignment now precludes commitment to DJJ. (See Welf. & Inst. Code,[1] § 736.5.)

FACTUAL AND PROCEDURAL BACKGROUND

In the fall of 2019, a large group of teenagers including 16-year-old Miguel C. gathered at Grove Park in Escondido and severely beat M.R., who later died from blunt force trauma. One witness told police officers she saw about 20 young people "jump" M.R., using skateboards and knives in the attack. A hammer recovered near the scene was likely also used as a weapon. Officers who responded detained several suspects, including one minor who had recorded part of the beating on her cellphone. The video showed about 30 seconds of the incident and captured over 70 blows aimed at the victim from multiple youths involved in the assault.

While officers were responding to the initial assault, another attack was reported just a few blocks away. After leaving Grove Park, Miguel accosted a man as he was parking his car to unload groceries, punching him in the head repeatedly. When the man attempted to run away—abandoning his car in the process—Miguel pursued him and punched him in the head again. Miguel was then arrested, and quickly connected to the earlier Grove Park assault.

The video, a witness account, and some details provided by the teenagers involved confirmed that Miguel was a primary actor in the assault

---

[1]     Further undesignated statutory references are to the Welfare and Institutions Code.

3

on M.R.—though it appeared he did not use any weapons. Miguel consistently maintained that he did not remember the park incident or attacking the second man because he blacked out from excessive alcohol consumption, in addition to ingesting cocaine.

Investigators eventually determined that the fatal assault at Grove Park was gang related. M.R. was apparently a known associate of the Diablos gang, which has recently been feuding with a tagging crew known as "B.A.D-K." or "B.D.K." Miguel denied any B.D.K association, but admitted his friends were members and said that if the group had encountered a Diablos associate, they would probably "jump" that person. There were conflicting stories about how the fight started. At least two accounts from the teenagers indicated M.R. attacked Miguel first, putting him in a chokehold. But an uninvolved witness watched the group surround M.R. before attacking him, apparently unprovoked.

A juvenile wardship petition filed by the San Diego District Attorney alleged that Miguel had committed murder for the benefit of a criminal street gang (Pen. Code, §§ 187, subd. (a), 186.22, subd. (b)(1)), and assault likely to produce great bodily injury (*id.*, § 245, subd. (a)(4)). The petition was later amended to include a manslaughter charge for the benefit of a gang (Pen. Code, §§ 192, subd. (a), 186.22, subd. (b)(1)), to which Miguel pleaded guilty in exchange for dismissal of the other charges.

While the violence committed in the span of a few minutes by the group of minors–and particularly by Miguel—is both tragic and stunning, Miguel's previously unblemished record only makes his participation more perplexing. He had never been arrested, and was not even documented as a potential gang associate. As his defense attorney explained to the court, she would usually have contested the gang enhancement for a case like this, but

4

counseled her client to accept it as part of his plea deal because the prosecutor's overall offer was reasonable.

The defense retained Dr. Gimel Rogers, a clinical psychologist, to evaluate Miguel. She chronicled his difficult family history, which included neglect and abandonment by his parents—both of whom have addictions that inhibited their ability to care for Miguel and his siblings. Miguel was exposed to substance abuse in early childhood, and although his home life improved significantly since he went to live with his aunt at the age of 12, that was also about the age he began using marijuana heavily. Miguel disclosed that by the time he was 16, he was using alcohol, marijuana, and methamphetamine on a regular basis.

Dr. Rogers diagnosed Miguel with severe substance use disorders for alcohol and cannabis, and a moderate use disorder for methamphetamine. She indicated that he also dealt with anxiety and depression, as well as behavioral issues such as running away from home and fighting. Despite these challenges, she found Miguel demonstrated resilient characteristics and could overcome adversity, but would need intensive therapy to help with his substance abuse and to address his family history. Dr. Rogers did not consider Miguel to be gang entrenched, and believed that he did not remember the assault given the evidence corroborating Miguel's account of his state of mind,[2] and the mixture of substances he had consumed.

Dr. Rogers assessed Miguel to have a low to moderate risk of committing future serious violence, noting that most of his risk factors were

---

[2] Among other things, Dr. Rogers took note of the transcript of an audio recording of Miguel and another involved youth talking in the back of a police car after the incident, while they were alone and unaware that they were being recorded. Miguel consistently stated that he did remember anything and asked the other minor a lot of questions about what occurred.

5

historical, such as early caregiver disruption, and that his protective factors going forward were promising, such as strong social support and positive attitudes toward intervention and authority. Ultimately, Dr. Rogers recommended Miguel be placed in a lower level security structured environment, such as the youthful offender rehabilitation program offered at Youthful Offender Units (YOU), and warned that a commitment to a higher level security environment such as the DJJ might put his rehabilitative chances at risk by exposing him to more drugs, higher instances of violence, and a social structure revolving around gang affiliation.[3]

In contrast, the probation department prepared a social study that judged Miguel's recidivism risk to be high and recommended a commitment to DJJ. The report put particular emphasis on the seriousness of Miguel's crimes, and four documented fights he was involved in at Juvenile Hall. Although the report acknowledged that Miguel was performing well in other ways, having improved significantly in his schoolwork while in custody, it nonetheless concluded that this was evidence that Miguel "responds well" when "placed in a structured environment" before recommending a more secure setting. The report acknowledged that Dr. Rogers's primary diagnosis concerned Miguel's substance abuse, but said nothing about her conclusion that a DJJ placement would undermine Miguel's rehabilitation. It also listed

---

[3] Megan Baldwin, senior program manager of the Second Chance Youthful Offender Rehabilitation Program had not evaluated Miguel but testified generally about programs offered through YOU specifically for gang at-risk youth. Core curricula help youth offenders examine the behaviors that brought them to juvenile hall, overcome gang mentalities, and address their substance abuse. Upon release, minors continue to work with regional counselors throughout the probationary term who can refer them to appropriate programs and services.

6

programs available at DJJ that it thought Miguel would benefit from, one of which was a substance abuse program.

At Miguel's contested disposition hearing, the defense asked for Miguel to be given an opportunity in the less restrictive YOU program. Dr. Rogers testified and reiterated her conclusion that YOU would be a more appropriate placement than DJJ. A senior program manager for YOU also testified and detailed the support programs available for youth at risk of gang involvement and those with substance abuse issues. She specified that minors can typically stay at YOU for 6 to 12 months, with counseling support that usually lasts 12 to 18 months and ends when a youth's probation period is over.

The People presented no witnesses and relied solely on the probation report. In her closing argument, the prosecutor asked for a DJJ commitment because she thought the 12 month residential program that YOU could offer would not be long enough to rehabilitate Miguel. The court ultimately agreed, committing Miguel to DJJ for the maximum term of 16 years (6 years for the manslaughter plus 10 for the gang enhancement) based on its concern that Miguel needed to be in a structured environment for as long as possible to have the best chance at rehabilitation.

## DISCUSSION

Miguel raises only one issue on appeal, citing the Court of Appeal opinion in *Carlos J., supra,* 22 Cal.App.5th 1 and arguing there was insufficient evidence to support the juvenile court's decision to commit him to the DJJ instead of employing a less restrictive option. We agree that the present record fails to adequately address and respond to evidence indicating that a DJJ commitment would be *counterproductive.* Accordingly, and

7

without expressing any view on the ultimate outcome, we reverse and remand for a new dispositional hearing.

A.    *Background:  The Shifting Landscape of Juvenile Justice*

In *In re Aline D.* (1975) 14 Cal.3d 557 (*Aline D.*), our Supreme Court explained that " '[t]he statutory scheme . . . as now embodied in sections 730 et seq. of the Welfare and Institutions Code, contemplates a progressively restrictive and punitive series of disposition orders . . . namely, home placement under supervision, foster home placement, placement in a local treatment facility and, as a last resort, Youth Authority placement.' "[4] (*Aline D.*, at p. 564.)  A graduated approach to disposition orders became "a major component of Juvenile Court Law" whose application was not limited to less violent offenders.  (*In re Michael R.* (1977) 73 Cal.App.3d 327, 334 (*Michael R.*).)

The analysis changed slightly in 1984, when statutory amendments to section 202 expanded the focus of the court's placement decision to "recognize[ ] punishment as a rehabilitative tool and emphasize[ ] the protection and safety of the public."  (*In re Lorenza M.* (1989) 212 Cal.App.3d 49, 57; § 202.)  Before the 1984 amendment, a minor's rehabilitation was the only permissible concern in determining a proper placement.  (*Lorenza M.*, at p. 57; *In re Michael D.* (1987) 188 Cal.App.3d 1392, 1396.)  Although the post-amendment scheme continued to contemplate "a progressively more restrictive and punitive series of dispositions" with DJJ "normally a placement of last resort" (*In re M.S.* (2009) 174 Cal.App.4th 1241, 1250), it placed no absolute bar on commitment to DJJ in the first instance so long as evidence showed a probable benefit to the minor and the ineffectiveness or

---

[4]    The DJJ was previously known as the California Youth Authority (CYA).  (*People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 306.)

8

inappropriateness of less restrictive alternatives. (*In re Carl N.* (2008) 160 Cal.App.4th 423, 433(*Carl N.*); *In re Teofilio A.* (1989) 210 Cal.App.3d 571, 576–577 (*Teofilio A.*); *In re George M.* (1993) 14 Cal.App.4th 376, 379 (*George M.*); *In re Eddie M.* (2003) 31 Cal.4th 480, 488; § 734.)

More recently, the pendulum has shifted back toward primarily rehabilitative aims, with the Legislature in 2020 overhauling the juvenile court law through "juvenile justice realignment." (See Stats. 2020, ch. 337 (Sen. Bill No. 823).) By closing DJJ and transferring jurisdiction over youth offenders to counties, the stated purpose of juvenile justice realignment is "[t]o ensure that justice-involved youth are closer to their families and communities and receive age-appropriate treatment." (*Id.*, § 1(b).) The expansive legislation draws from evidence that "justice system-involved youth are more successful when they remain connected to their families and communities," have lower recidivism rates, and are better prepared to transition back into their communities. (*Id.*, § 1(a).) To implement realignment, counties are to be given funding to implement public health and community based programs that support positive youth development and reduce crime. (*Id.*, § 1(c).) A new Office of Youth and Community Restoration, housed under the Health and Human Services Agency rather than the Department of Corrections and Rehabilitation, is tasked with helping counties make the transition, including by promoting "trauma responsive, culturally informed services for youth involved in the juvenile justice system." (Legis. Counsel's Dig., Sen. Bill No. 823 (2019–2020 Reg. Sess.); § 2200.)

The realignment bill substantively rewrote major portions of the juvenile court law. Effective July 1, 2021, newly enacted section 736.5 shifts responsibility for convicted youth offenders from DJJ to the county level.

(§ 736.5, subd. (a).)  All wards committed to DJJ prior to July 1, 2021 will remain in DJJ custody.  (*Id.*, subd. (d).)  But pending final closure of DJJ in June 2023, a court may *only* make a DJJ commitment if the minor "is otherwise eligible to be committed under existing law and in whose case a motion to transfer the minor from juvenile court to a court of criminal jurisdiction was filed."  (*Id.*, subds. (b), (c), (e); see also § 733.1, subds. (a)−(b).)  As an alternative to DJJ commitment, courts "shall consider . . . placement in local programs," including county level programs created to implement realignment.  (§ 736.5, subd. (c).)  Although realignment does not change section 202, which recognizes punishment as a potential rehabilitative tool, the new scheme implicitly places less weight on punishment by prioritizing treatment and restricting commitment avenues.

California's shifting landscape on juvenile justice is in keeping with broader trends.  Landmark juvenile criminal cases in recent decades have increasingly recognized that all juvenile offenders are presumptively capable of rehabilitation—even those who have committed terrible crimes.  As the United States Supreme Court observed in *Roper v. Simmons* (2005) 543 U.S. 551, 570, "the character of a juvenile is not as well formed as that of an adult[,]" and consequently, "[t]he personality traits of juveniles are more transitory, less fixed."  Although this reality is perhaps self-evident to anyone who remembers their own adolescence or has guided a child through that tumultuous time (*J.D.B. v. North Carolina* (2011) 564 U.S. 261, 272), scientific research increasingly supports the notion that juveniles are still changing:  "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds.  For example, parts of the brain involved in behavior control continue to mature through late adolescence.  [Citation.]  Juveniles are more capable of change than are

10

adults, and their actions are less likely to be evidence of 'irretrievably depraved character' than are the actions of adults." (*Graham v. Florida* (2010) 560 U.S. 48, 68; accord *Miller v. Alabama* (2012) 567 U.S. 460, 471– 480.)

Given these developments and the significant rehabilitative focus of our state's juvenile court law even pre-realignment, the prospect that a particular sentencing decision might place a minor in a setting that is likely to entrench nascent criminal tendencies rather than encourage reform is particularly concerning. As such, cases like this one where a child with no prior record is committed to the DJJ after a first offense—albeit a serious one—merit particular scrutiny. Miguel was committed to DJJ in August 2020, before juvenile justice realignment took effect. Even so, his commitment to DJJ in the first instance may be upheld only upon a showing of probable benefit to Miguel and ineffectiveness or inappropriateness of less restrictive alternatives. (*Carl N., supra,* 160 Cal.App.4th at p. 433; *Teofilio A., supra,* 210 Cal.App.3d at p. 576.)

B.    *Substantial Evidence Review*

We review a juvenile court's placement decision for abuse of discretion. (*Carl N., supra,* 160 Cal.App.4th at pp. 431−432.) " ' "[A] trial court abuses its discretion when the factual findings critical to its decision find no support in the evidence." ' " (*In re Nicole H.* (2016) 244 Cal.App.4th 1150, 1154.) Accordingly, we consider whether substantial evidence supports the juvenile court's commitment order consistent with the purpose of the juvenile court law. (*Ibid.*; *Teofilio A., supra*, 210 Cal.App.3d at p. 579.) Substantial evidence, in turn, "must be reasonable in nature, credible, and of solid value; it must actually be 'substantial' proof of the essentials which the law requires in a particular case." (*Estate of Teed* (1952) 112 Cal.App.2d 638, 644.)

11

Miguel questions whether this threshold was met in his case, and we find considerable guidance for evaluating his argument in the relatively recent *Carlos J.* opinion from the First Appellate District. (*Carlos J., supra,* 22 Cal.App.5th 1.) *Carlos J.* involved a minor in much the same position as Miguel—lacking a serious criminal record but sent to DJJ after committing a violent crime. Carlos, who was 15 at the time, confronted a rival gang associate who had apparently tried to "jump" Carlos the previous year. (*Id.* at pp. 4, 7.) After exchanging words, Carlos and an older member of his gang who was with him "drew firearms and shot five or six times in the direction of the victim" who then fled, fortuitously escaping without injury. (*Id.* at p. 4.) Prior to this incident, Carlos had no "substantial" record, though he had previously been arrested and failed to complete a diversionary program. (*Id.* at p. 7, fn. 4.) He also struggled at school and had been cited for defiant behavior and fighting there. (*Id.* at p. 7.)

A psychologist who evaluated Carlos explained that he had a " 'history of trauma and active PTSD,' " but noted he was amenable to treatment, and identified " 'individual psycho-therapy' " as his primary need. (*Carlos J.*, *supra*, 22 Cal.App.5th at p. 8.) She did not favor a DJJ placement for Carlos, noting that given his youth and the nature of his trauma he would benefit from " 'high structure and therapy' " in a less restrictive setting. (*Ibid.*) The probation department made a contrary recommendation for a DJJ commitment. It acknowledged the psychologist's report but also asserted that Carlos posed a public safety risk and concluded, " 'he must be contained in a state facility where his educational, therapeutic, and emotional issues can be addressed in a secured facility.' " (*Id.* at pp. 8–9.) This was the only evidence submitted to support the People's placement recommendation. The

12

juvenile court ultimately committed Carlos to DJJ, citing the seriousness of his crime, his gang activity, and the danger to public safety. (*Id.* at pp. 9–10.)

In reversing, the appellate court explained that there was "no evidence before the juvenile court regarding any 'intensive treatment' appellant might receive at [DJJ]," information that would have been *necessary* for the court to conclude that a DJJ commitment would probably benefit Carlos by meeting his most pressing needs. (*Carlos J., supra*, 22 Cal.App.5th at p. 10.) It also identified the "need to weaken [Carlos's] affiliation with the Sureños gang" as a "critical issue for the juvenile court to consider in determining probable benefit." (*Id.* at p. 11.) The court explained that the probation officer's recommendation amounted to an "unexplained and unsupported assertion of possible benefit . . . not evidence of 'reasonable, credible and of solid value' from which the juvenile court could make an informed assessment of the likelihood a [DJJ] placement would be of benefit to appellant, in light of his specific needs." (*Id.* at p. 10.) Because "the law required the juvenile court, not the probation department, to make the finding of probable benefit," and there was no "evidence in the record of the programs at the [DJJ] expected to be of benefit to appellant," the commitment could not stand. (*Ibid.*)

In coming to this conclusion, the *Carlos J.* court explained that there are two evidentiary thresholds the People must meet to support a DJJ commitment. As an initial, preliminary showing, the probation department is required to (1) identify programs at DJJ that would likely benefit the particular minor, and (2) "include *brief* descriptions of the relevant programs." (*Carlos J., supra*, 22 Cal.App.5th at p. 12.) The failure of evidence at this initial step prompted the reversal in *Carlos J.*

But the opinion went on to discuss what was required once the People clear the first evidentiary hurdle. Of particular relevance here, the appellate

13

court commented that after the People make a minimal showing to support a DJJ commitment for a particular minor, the minor might then "dispute the availability or efficacy of particular programs, or . . . suggest that other conditions at the [DJJ] undermine the programs [by presenting] sufficient evidence to reasonably bring into question the benefit he or she will receive . . . ." (*Carlos J., supra*, 22 Cal.App.5th at p. 13.) In the event of credible opposing evidence, the People would then be obligated "to present more indepth information about the [DJJ] in order to show probable benefit." (*Id.* at p. 14.)

Our case appears to pick up where *Carlos J.* left off, at this second step. The probation study in this case provided a list of DJJ programs, with brief descriptions, that it thought Miguel could benefit from—one of which addressed substance abuse, identified by Dr. Rogers as Miguel's primary treatment need. The inclusion of this information in the study appears to meet the initial minimal showing described in *Carlos J.* (22 Cal.App.5th at p. 12.) But Miguel then countered with evidence that a DJJ commitment would actually be *adverse* to his rehabilitation given his particular needs, identifying "other conditions at the DJJ," namely the ready availability of drugs and the entrenched gang atmosphere, that would probably undermine the efficacy of DJJ's programming for him. (See *id.* at p. 13.) Because this evidence came from Dr. Rogers's clinical assessment of how Miguel would respond to the DJJ environment, it was "of 'reasonable, credible and . . . solid value' " and called into question the probation study's conclusion that a DJJ commitment would benefit Miguel. (*Id.* at pp. 10, 13.)

Consistent with the sequential process outlined in *Carlos J.*, we conclude that in response to Dr. Rogers's report and opinions the People were obligated to provide the court with some additional information that would

enable it to make a comparative analysis of the benefit to Miguel of the different placement options prior to deciding whether Miguel would likely benefit from DJJ, and whether other options would be ineffective or inappropriate. By way of example, *Carlos J.* explained that the People might counter evidence that the gang environment in DJJ would be detrimental to the minor's particular needs "with testimony showing improvements in the gang intervention programs or showing flaws in the analysis in the minor's evidence. Such information would enable the juvenile court to balance the benefits of the gang intervention services against the risk that confinement at the [DJJ] would harden the minor's gang affiliation and criminality." (*Carlos J.*, *supra*, 22 Cal.App.5th at p. 14.) Only after hearing such evidence could the juvenile court fulfill its obligation to "consider 'the broadest range of information' in determining how best to rehabilitate a minor and afford him adequate care." (*In re Robert H.* (2002) 96 Cal.App.4th 1317, 1329.)

Here, the People relied solely on the probation study, which failed to address the substance of Dr. Rogers's analysis or provide a contrary expert opinion.[5] Moreover, given Miguel's lack of history in the juvenile system, the court had less evidence than it often does to assess whether less restrictive placement options would fail. (Compare *In re A.R.* (2018) 24 Cal.App.5th 1076, 1081 [upholding a DJJ commitment where "Minor had a long history with the juvenile system and the juvenile court had already tried various less restrictive placements"] with *Michael R., supra,* 73 Cal.App.3d at pp. 338–339 ["We cannot assume without some evidence on the record that minor will not respond" to the rehabilitative programs available at less restrictive

---

[5] The probation study essentially dismissed Dr. Rogers's findings by summarizing them, and then moving on to its DJJ recommendation without offering further information or discussion.

placements]; see also *In re Calvin S.* (2016) 5 Cal.App.5th 522, 532 [reversing a DJJ commitment where there was no "valid reason, supported by admissible evidence" that the less restrictive placement option "would be ineffective or inappropriate"].)  In such circumstances, we cannot say the commitment to DJJ was based on credible evidence supporting the legally required findings.

In reaching this conclusion, we are sensitive to the traditional deference shown to the juvenile court in these matters.  We reverse only for an abuse of discretion.  (*George M., supra*, 14 Cal.App.4th at p. 379.)  But an abuse of discretion occurs when there is not enough evidence to support the findings that are necessary before committing a minor to DJJ.  (*Teofilio A., supra*, 210 Cal.App.3d at p. 579.)  "The bottom line is that, where a minor has concerns about a particular aspect of the [DJJ] and presents evidence supporting those concerns, it may be necessary for the People to provide additional information to the juvenile court in order for the court to make a properly supported finding of probable benefit."  (*Carlos J., supra,* 22 Cal.App.5th at p. 14.)  This is such a case.

C. *Proceedings on Remand*

Ordinarily, proceedings on remand would follow a predictable course. The People would have the opportunity at a new disposition hearing to provide additional information supporting their view that commitment carries a probable benefit to Miguel notwithstanding his articulated concerns. Nothing in our opinion would be construed to undermine the juvenile court's consideration of permissible factors in its placement decision.  Public safety, which appears to have animated the court's decision both here and in *Carlos J.*, remains a consideration explicitly permitted by the law (§ 202), and the trial court would be entrusted with determining the level of security and

16

length of time necessary for the minor's commitment on a more developed record.

Before making such an inquiry, however, the sweeping juvenile justice realignment reforms effected by Senate Bill No. 823 require the juvenile court to consider as a threshold matter whether commitment to DJJ remains permissible. (See, e.g., *Dix v. Superior Court* (1991) 53 Cal.3d 442, 460 ["when a case is remanded for resentencing after an appeal, the defendant is entitled to 'all the normal rights and procedures available at his original sentencing' [citations], including consideration of any pertinent circumstances which have arisen since the prior sentence was imposed"].) We leave it to the trial court whether to invite briefing from the parties on the scope and effect of realignment, including newly enacted section 736.5, in making this decision. Only if commitment to DJJ remains an option need the court consider whether, on a more fully developed record, it would confer a probable benefit to Miguel consistent with the juvenile court law's intended purpose. (*Carlos J., supra,* 22 Cal.App.5th at p. 14; *Teofilio A., supra*, 210 Cal.App.3d at p. 579.) And if the court finds section 736.5 precludes commitment, it must reach an alternative placement decision.

17

DISPOSITION

The order committing Miguel to DJJ is reversed, and the matter is remanded to the juvenile court for a new disposition hearing consistent with this opinion.

DATO, J.

WE CONCUR:

AARON, Acting P. J.

IRION, J.