Filed 6/12/24 In re L.L. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re L.L., a Person Coming Under the Juvenile Court Law. | B328327 |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>L.L.,<br><br>    Minor and Appellant. | Los Angeles County<br>Super. Ct. No. NJ30422 |

APPEAL from an order of the Superior Court of Los Angeles County, John C. Lawson II, Judge. Affirmed.

Courtney M. Selan, under appointment by the Court of Appeal, for Minor and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

In this juvenile wardship proceeding under Welfare and Institutions Code[1] section 602, the juvenile court sustained a petition alleging that L.L. had committed murder and attempted murder. On appeal, L.L. contends that the court abused its discretion in committing him to a secure youth treatment facility (SYTF), rather than attempting a less restrictive alternative. Relying on *In re Ernesto L.* (2022) 81 Cal.App.5th 31 (*Ernesto L.*), L.L. further argues that the court erred in applying his precommitment custody credits to his maximum term of confinement rather than the baseline term of confinement under section 875 and that the court violated his equal protection rights in so doing. We affirm.

## PROCEDURAL BACKGROUND

In July 2022, the Los Angeles County District Attorney filed a petition under section 602 alleging that L.L., who was then 15 years old, had committed murder (Pen. Code, § 187, subd. (a); count 1) and attempted murder (Pen. Code, §§ 664/187, subd. (a); count 2) on June 3, 2022. L.L. was detained on July 26, 2022.

Following an adjudication hearing, the juvenile court found both counts to be true beyond a reasonable doubt and sustained the petition.[2] In preparation for the hearing, the court reviewed the probation officer's report, supplemental reports concerning

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

[2] At the disposition hearing, the court clarified that the murder was second degree murder.

L.L.'s behavior while detained, the sentencing memoranda submitted by the parties, and section 875. The court explained that it understood that L.L. had no prior history with the juvenile justice system. It acknowledged that it had broad discretion to determine an appropriate placement, taking into consideration public safety, safety of the minor, and the interests of facilitating rehabilitation while preventing future offenses. Under section 875, subdivision (a), the court found that L.L. was at least 15 years old at the time of the offenses and the offenses were offenses described in section 707, subdivision (b). Considering the severity of the offenses, L.L.'s voluntary and active participation in the crimes, and the fact that he was "entrenched" in gang culture, the court concluded that a SYTF placement was appropriate. The court explained that the programming, treatment, and education (including continued education and community college courses) offered in a SYTF were appropriate to meet L.L.'s treatment and security needs. It concluded that a less restrictive disposition would not achieve the goals of rehabilitation and community safety in light of the severity of the crimes.

The court set a maximum term of confinement of 17 years four months to life and a baseline term of seven years. The court applied 279 days of precommitment custody to the maximum term of confinement.

L.L. timely appealed.

## FACTUAL BACKGROUND

On the evening of June 3, 2022, Krystal Delgado, who was staying with her friend, Duwayne Thomas, texted or called Thomas to ask whether he wanted to go get food. Thomas agreed and asked Delgado to meet him at the apartment they were

3

sharing. Delgado parked her car in the alley next to the apartment and went inside to use the restroom. While inside, she heard four gunshots back-to-back. She did not hear any fighting or shouting. Delgado looked out the back door of the apartment and saw Thomas on the ground in the alley. She rushed down to see what happened and saw him bleeding out. She returned to the apartment to get her phone and called 911.

Katherine Murison lived in a nearby apartment. On the evening of June 3, 2022, she went to her car, which was parked in the alley, to pick up her boyfriend from work. Another car was parked with its lights on, facing her car, and blocking her exit from the alley in that direction. Murison decided to wait to see if the car would move. She was looking down when she heard at least four loud, rapid pops. Murison did not see any lights but believed the sound was caused by fireworks. She was about to turn her car around to exit the alley in the other direction when she heard the sound of something slamming and the sound of shoes on gravel. Murison saw at least one male but believed there were three. She made eye contact with one individual who pointed a gun at her driver's side window and shot at her multiple times. The window shattered and Murison slumped over the center console of her car. She felt a searing pain in her thigh and a soreness in her upper back. She did not see anyone else fire at her. Murison remained quiet and slumped over the console after the initial shots in case the men doubled back. She waited for a few seconds before leaving her car and returning to her apartment building, where she called for help. Murison was ultimately taken to the hospital where her leg was bandaged. A bullet was lodged in her upper back, which was later removed in an out-patient procedure.

When officers arrived at the scene at around 10:56 p.m., Thomas was facedown in a pool of blood. An autopsy determined that Thomas suffered seven gunshot wounds, including two gunshot wounds to the head, which were fatal. The cause of death was determined to be multiple gunshot wounds.

Officers located several cameras in the area and obtained the footage from the individuals to whom the cameras belonged. Based on the video evidence, they determined three individuals entered the alley shortly before the shootings took place and two of them opened fire on Thomas, unprovoked. Thomas fell to the ground and the suspects ran north in the alley. Officers were able to identify the outfits worn by the three suspects. The video also captured audio, including the sound of additional gunshots after the shooting of Thomas and a woman crying out for help. Based on the car that one of the suspects was driving in a video, officers were able to identify the individual as Filasifoki Pio.

Detectives identified an Instagram account they believed belonged to Pio and obtained the records for that account with a search warrant. These records included the account's messaging history. At 11:06 p.m. on June 3, 2022, shortly after the shootings, someone shared an Instagram post describing the shootings in a group chat including Pio. An account with the name "Eaglest.sagger" wrote, " 'Just know bkadnews is a boy.' " Eaglest.sagger later re-sent the post describing the crime and stated, " 'That's my new dance move.' " Eaglest.sagger also wrote, " 'That n-i-g-g-a family gonna hate me n Bkadnews.' " A video sent by Eaglest.sagger also showed two individuals in clothes that matched the surveillance videos obtained by the police. One of them was Pio and the other was L.L.

On June 5, 2022, Pio messaged the group, " 'They just picced up the video from Mya's mom house.' " This message was sent shortly after an officer picked up a DVR containing surveillance footage from one of the properties near where the shooting took place. Eaglest.sagger wrote " 'It is what it is at the end of the day' " and " 'Love y'all tho we gonna be ok.' " Bkadnews wrote, " 'We gonna be smoove.' " Eaglest.sagger replied, " ' "Regalrdless" u are.' [¶] 'Ur 15.' "

Detectives issued search warrants for the Eaglest.sagger and Bkadnews accounts and determined that the Eaglest.sagger account belonged to Santiago Rivera and the Bkadnews account belonged to L.L. On June 8, 2022, Rivera sent a picture of himself holding a black pistol and wearing the outfit captured in the surveillance videos from the day of the murder, as well as a photo of Thomas in the group chat. On June 10, 2022, a photo sent in the group chat showed L.L. shirtless. No tattoo was visible in the picture. However, when L.L. was arrested on July 21, 2022, his booking photograph reflected that he had a large tattoo spanning the width of his chest that read "Exotic Family." Detectives also obtained the record for Thomas's Instagram account but did not find any interactions between his account and that of the suspects.

## DISCUSSION

### 1. The court did not abuse its discretion in ordering L.L. committed to a SYTF.

A juvenile court may order commitment to a SYTF if each of the following criteria under section 875 is met: "(1) The juvenile is adjudicated and found to be a ward of the court based on an offense listed in subdivision (b) of Section 707 that was

6

committed when the juvenile was 14 years of age or older. [¶] (2) The adjudication described in paragraph (1) is the most recent offense for which the juvenile has been adjudicated. [¶] (3) The court has made a finding on the record that a less restrictive, alternative disposition for the ward is unsuitable." (§ 875, subd. (a)(1)–(3).)

L.L. does not argue that the court failed to make the finding required under the third criterion but that it erred in finding that a less restrictive alternative disposition would not be suitable. To determine whether a less restrictive alternative disposition is unsuitable, "the court shall consider all relevant and material evidence, including the recommendations of counsel, the probation department," and each of the following criteria: "(A) The severity of the offense or offenses for which the ward has been most recently adjudicated, including the ward's role in the offense, the ward's behavior, and harm done to victims. [¶] (B) The ward's previous delinquent history, including the adequacy and success of previous attempts by the juvenile court to rehabilitate the ward. [¶] (C) Whether the programming, treatment, and education offered and provided in a secure youth treatment facility is appropriate to meet the treatment and security needs of the ward. [¶] (D) Whether the goals of rehabilitation and community safety can be met by assigning the ward to an alternative, less restrictive disposition that is available to the court. [¶] (E) The ward's age, developmental maturity, mental and emotional health, sexual orientation, gender identity and expression, and any disabilities or special needs affecting the safety or suitability of committing the ward to a term of confinement in a secure youth treatment facility." (§ 875, subd. (a)(3).)

7

We review the juvenile court's placement decision for an abuse of discretion. (*In re Nicole H.* (2016) 244 Cal.App.4th 1150, 1154.) The juvenile court abuses its discretion " ' " 'when the factual findings critical to its decision find no support in the evidence.' " ' " (*In re Carlos J.* (2018) 22 Cal.App.5th 1, 5.) We will not disturb the juvenile court's findings when there is substantial evidence to support them. (*In re Khalid B.* (2015) 233 Cal.App.4th 1285, 1288.) " ' " 'In determining whether there was substantial evidence to support the commitment, we must examine the record presented at the disposition hearing in light of the purposes of the Juvenile Court Law,' " ' " which includes public safety as well as the rehabilitation of the juvenile offender. (*Carlos J.*, at p. 5, quoting *In re Calvin S.* (2016) 5 Cal.App.5th 522, 527–528; § 202.)

The record shows that the court carefully considered all the relevant evidence and criteria in determining that a less restrictive placement was not suitable, including L.L.'s lack of any previous delinquent history, the severity of the offenses (including the scope of L.L.'s role and the harm inflicted on the victims), and the programming available at a SYTF. The court acknowledged that it had discretion to choose a less restrictive alternative, such as placing L.L. in his home with probation, or sending him to a camp, but concluded that these less restrictive alternatives were inappropriate in light of the severity of the crimes. The court stated that, despite the absence of prior offenses, the evidence showed that L.L. was "entrenched in . . . gang glorification." The court found that a SYTF had resources to educate and rehabilitate L.L. and was "also a secure location, because the court has to be concerned both for the safety of the community and the safety of the minor." The court

8

instructed that L.L. should be involved in anger management classes, violence prevention classes, gang intervention programming, and continued educational services, including college-level courses when appropriate at a SYTF.[3]

Our Supreme Court and the Courts of Appeal have consistently recognized that juvenile courts are not required to attempt a less restrictive placement before ordering a more restrictive one.[4] (See *In re Ricky H.* (1981) 30 Cal.3d 176, 183 ["there is no absolute rule that a [CYA] commitment should never be ordered unless less restrictive placements have been attempted"]; *In re John H.* (1978) 21 Cal.3d 18, 27 [rejecting assertion that less restrictive placement must first be attempted; "[t]o the contrary, circumstances in a particular case may well suggest the desirability of a [CYA] commitment despite the

---

[3] The probation report, which the court reviewed, argued that less restrictive alternatives would be inadequate because none had a sufficiently long duration to ensure public safety while allowing an opportunity for rehabilitation. It also identified "mental health[] and substance abuse services" and "provisional assistance and guidance for humanity classes involving religion, arts and written expressions for continuous engagement with the youth."

[4] " 'Effective July 1, 2005, the correctional agency formerly known as the California Youth Authority (CYA) became known as [DJF]. DJF is part of the Division of Juvenile Justice [DJJ], which in turn is part of the Department of Corrections and Rehabilitation. [Citations.] Statutes that formerly referred to CYA . . . now refer to DJF.' [Citations.]" (*In re Albert W.* (2015) 240 Cal.App.4th 411, 413, fn. 1.) "[I]n 2020 the Legislature passed 'juvenile justice realignment' through Senate Bill No. 823 (2019–2020 Reg. Sess.) (Stats. 2020, ch. 337). 'Effective July 1, 2021, newly enacted section 736.5 shift[ed] responsibility for convicted youth offenders from DJJ to the county level. [Citation.]' " (*In re J.B.* (2022) 75 Cal.App.5th 410, 413, fn. 3.)

availability of such alternative dispositions as placement in a county camp or ranch"]; *In re Nicole H.*, *supra*, 244 Cal.App.4th at p. 1159 ["there is no rule that such a placement cannot be ordered unless less restrictive placements have been attempted"]; *In re M.S.* (2009) 174 Cal.App.4th 1241, 1250 [same]; *In re Asean D.* (1993) 14 Cal.App.4th 467, 473 ["it is clear that a commitment to the [CYA] may be made in the first instance, without previous resort to less restrictive placements"].)

The cases cited by L.L. do not compel the conclusion that the court abused its discretion in ordering a commitment to a SYTF. Like the cases cited above, the court in *In re James H.* (1985) 165 Cal.App.3d 911, 922, recognized that "there is no absolute rule barring [CYA] placement until less restrictive placements have been attempted." Likewise, the court in *In re Carl N.* (2008) 160 Cal.App.4th 423, 433, observed that "[i]t is . . . clear . . . [citation], that a commitment to CYA 'may be made in the first instance, without previous resort to less restrictive placements.' " Moreover, none of the cases L.L. cites involved appellants who had committed murder or attempted murder. (*See James H.*, at p. 915 [minor was charged with burglary]; *In re Pedro M.* (2000) 81 Cal.App.4th 550, 553 [minor admitted that he committed lewd acts on a minor under 14 years and burglary]; *Carl N.*, at p. 425 [minor admitted to violating probation following "long history of juvenile delinquency (including vandalism, gang activity, drug abuse, a felony assault, and multiple violations of probation)"].) Section 875, subdivision (a), is clear that the decision whether to commit a ward to a SYTF must be based on the consideration of the specific circumstances of the juvenile before the court, not by reference to other juveniles. The fact that the juvenile courts in those cases had attempted less

restrictive alternatives (*Pedro M.*, at pp. 555–556), or that the appellants had less restrictive placements in the past (*James H.*, at p. 923; *Carl N.*, at pp. 433–435), does not demonstrate that the court here abused its discretion in ordering L.L. to a SYTF even though he had no prior juvenile record. The court could reasonably conclude, as the probation report indicated, that no shorter and less restrictive program would be sufficient to address the circumstances, including gang entrenchment, that led L.L. to kill one person and attempt to kill another.

In sum, even if the record indicates the presence of factors that could support a less restrictive disposition, nothing in the record compels such a result. (See *In re Reynaldo R.* (1978) 86 Cal.App.3d 250, 256 [DJJ commitment was not an abuse of discretion even if minor's record justified less restrictive disposition].) There was substantial evidence that L.L. could benefit from a SYTF commitment and the court reasonably believed a less restrictive disposition would not be adequate to hold L.L. accountable for the serious offenses he committed or to provide for the safety and protection of the public. The court did not abuse its discretion in ordering L.L. committed to a SYTF.

**2.     The court did not err in applying L.L.'s custody credits to the maximum term of confinement.**

    **2.1.     *Ernesto L.* does not compel the conclusion that custody credits must be applied against the baseline term.**

L.L. argues that his 279 days of precommitment custody credits should apply against his baseline term of seven years rather than against his 17 years four months to life maximum term of confinement. He relies on authority regarding commitments to the DJJ holding that a minor's precommitment

credits should be applied against a ward's actual maximum custodial term imposed under section 731, subdivision (b) rather than against the theoretical maximum calculated under section 726, subdivision (d). (*Ernesto L.*, *supra*, 81 Cal.App.5th at pp. 40–43.) Specifically, he contends that there was no practical distinction between the question facing the court in *Ernesto L.* and the question facing the juvenile court in this case and that the reasoning and holding of *Ernesto L.* should govern. We disagree.

In *Ernesto L.*, Division One of the First District held that when a minor is committed to the DJJ, the juvenile court must apply any precommitment custody credits against the maximum custodial term under section 731 rather than against the maximum exposure term of confinement set under section 726. (*Ernesto L.*, *supra*, 81 Cal.App.5th at p. 34.) The court disagreed with the Fourth Appellate District's holding in *In re A.R.* (2018) 24 Cal.App.5th 1076, that precommitment credits can be applied to the maximum exposure term instead of to the lower maximum custodial term. The court in *Ernesto L.* recognized that the reach of its holding was limited because of statutory amendments providing for the closure of the DJJ on June 30, 2023, but published the decision because of its disagreement with the holding of *A.R.* (*Ernesto L.*, at p. 34, fn. 2; § 736.5, subds. (b)–(c), (e).)

As explained in *Ernesto L.*, section 726 applies to minors removed from the physical custody of their parents or guardians due to a section 602 wardship petition, and section 731 governed confinement of minors committed to the DJJ. (*Ernesto L.*, *supra*, 81 Cal.App.5th at pp. 34–35.) Section 726 states that an order removing a minor from a parent or guardian's physical custody,

"shall specify that the minor may not be held in physical confinement for a period in excess of the middle term of imprisonment which could be imposed upon an adult convicted of the offense . . . which brought . . . the minor under the jurisdiction of the juvenile court." (§ 726, subd. (d)(1).) Section 731 states that a minor committed to the DJJ "shall not be confined in excess of the term of confinement set by the committing court. The court shall set a maximum term based upon the facts and circumstances of the matter . . . that brought . . . the ward under the jurisdiction of the court and as deemed appropriate to achieve rehabilitation. The court shall not commit a ward to the [DJJ] for a period that exceeds the middle term of imprisonment that could be imposed upon an adult convicted of the same offense." (§ 731, subd. (b).) Section 731 thus provides the juvenile court with discretion to impose a maximum term of confinement to the DJJ that is less than the middle term of imprisonment that could be imposed on an adult. (*Ernesto L.*, at pp. 39, 41.) *Ernesto L.* found that custody credits must be applied against the section 731 term because that was the "actual maximum custodial term" imposed by the court. (*Ernesto L.*, at p. 41.)

L.L. was committed to a SYTF pursuant to section 875, not to the DJJ pursuant to sections 726 and 731. Section 875, subdivision (b), provides that the juvenile court "shall set a baseline term of confinement," which "shall represent the time in custody necessary to meet the developmental and treatment needs of the ward and to prepare the ward for discharge to a period of probation supervision in the community." Subdivision (c) requires that "the court shall additionally set a maximum term of confinement for the ward," which "shall

13

represent the longest term of confinement in a facility that the ward may serve," and which "shall not exceed the middle term of imprisonment that can be imposed upon an adult convicted of the same offense[.]" (§ 875, subd. (c)(1) & (2).) Notably, as amended in 2022 (Stats. 2022, ch. 58, § 41), section 875, subdivision (c)(1)(C), provides that "[p]recommitment credits for time served must be applied against the maximum term of confinement as set pursuant to this subdivision." Because this statutory language is clear, we must follow it " ' " ' "unless a literal interpretation would result in absurd consequences the Legislature did not intend." ' " ' " (*Smith v. LoanMe, Inc.* (2021) 11 Cal.5th 183, 190.)

We do not find persuasive L.L.'s argument that section 875, subdivision (c)(2)'s definition of "maximum term of confinement" by reference to section 726, subdivision (c)(2), "directly contradicts subdivision (c)(1)," which "expressly contemplate[s] the maximum custodial term set forth by section 731." "[I]n interpreting legislation, we first look to the plain or ordinary meaning of the language used to determine the Legislature's intent, unless the language is uncertain. Every word and clause is given effect so that no part or provision is useless, deprived of meaning, or contradictory." (*Green v. Workers' Comp. Appeals Bd.* (2005) 127 Cal.App.4th 1426, 1435, fns. omitted.) Section 875, subdivision (c)(2) defines the "maximum term of confinement" by reference to the definition of "maximum term of imprisonment" in section 726, subdivision (d)(2). Section 875, subdivision (c)(1) states that "[t]he maximum term of confinement shall represent the longest term of confinement in a facility that the ward may serve *subject to*" the limitations set forth in paragraphs (A) and (B). (Italics added.) Giving effect to the plain language of the statute so that no portion is deprived of meaning or rendered

14

contradictory, "the maximum term of confinement as set pursuant to this subdivision" in subdivision (c)(1)(C) means "maximum term of confinement" as defined in subdivision (c)(2) *and* limited by subdivision (c)(1)(A) and (B).

We agree with the parties that there are significant parallels between section 875, subdivision (c)(1), and section 731, subdivision (b). However, this does not bolster L.L.'s argument that the reference to section 726 in section 875, subdivision (c)(2), creates a contradiction. Section 726, subdivision (d)(2), states that its definition of "maximum term of imprisonment" also applies to section 731. Thus, both section 731, subdivision (b), and section 875, subdivision (c), define the relevant maximum terms by reference to section 726, subdivision (d), but impose additional limitations. In both section 731 and section 875, the term is a maximum to be set by the court "based upon the facts and circumstances of the matter or matters that brought or continued the ward under the jurisdiction of the court and as deemed appropriate to achieve rehabilitation." (§§ 731, subd. (b), 875, subd. (c)(1).) Thus, as the Attorney General contends, the maximum custodial term under section 731 and addressed in *Ernesto L.* corresponds to the maximum term of confinement under section 875, subdivision (c), rather than to the baseline term.

Section 875, subdivision (e), explains how the SYTF baseline term is subject to change at six-month review hearings, at which the court may order either that the ward remain in custody for the remainder of the baseline term, modify the term downward, or order that the ward be assigned to a less restrictive program. (§ 875, subd. (e)(1).) At the conclusion of the baseline confinement term, the court is required to hold a probation

15

discharge hearing, at which the court reviews the ward's progress toward meeting his or her rehabilitation goals. The court "shall order that the ward be discharged to a period of probation supervision . . . , unless the court finds that the ward constitutes a substantial risk of imminent harm to others in the community if released," in which case the court may retain the ward in custody for an additional year. (*Id.*, subd. (e)(3).) The baseline term set by the juvenile court under section 875 is subject to change to address the ward's needs at each six-month review hearing and may be extended at the probation discharge hearing. (*Id.*, subd. (e).) There are no comparable provisions in section 731.

In light of the foregoing, we conclude that there is nothing absurd about applying precommitment custody credits to the maximum term of confinement such that we may disregard the plain language of the statute. These credits have nothing to do with a ward's rehabilitative progress. Applying them to the baseline confinement term would be inconsistent with the Legislature's intent that the baseline term of confinement be tailored to the ward's "developmental and treatment needs" and preparation for discharge from custody. (§ 875, subd. (b)(1).)

L.L. argues that *Ernesto L.* "firmly established that predisposition custody credits are to be applied to the imposed term and not to a 'theoretical maximum.' " We are not persuaded. "*Ernesto L.* did not announce a general rule that precommitment credits must be applied to any term that may be said . . . to be 'akin to a fixed release date.' " (*In re M.B.* (2024) 99 Cal.App.5th 435, 469 (*M.B.*).) Citing *People v. Riolo* (1983) 33 Cal.3d 223, 227, L.L. also contends that the baseline term is the actual physical term imposed. *Riolo* rejected the argument that presentence custody credits "should be deducted from the hypothetical term

that would have been imposed if the sentence had not been consecutive to another prison term—i.e., from the full base term for the offense plus any relevant enhancements—rather than from the sentence actually imposed." (*Id.* at p. 226.) Our high court held that this argument was refuted by the definition of "term of imprisonment" in the relevant Penal Code provision and by the use of the term in other sections of the Penal Code, which supported that it meant the actual sentence imposed by the court. (*Id.* at pp. 227–228.) Here, the plain language of section 875 refutes L.L.'s position that precommitment custody credits should be applied to the baseline term. Moreover, the baseline term is not equivalent to a determinate sentence. As discussed, it is subject to change at regular intervals depending on the ward's progress.

In sum, neither *Ernesto L.* nor the language of section 875 supports applying precommitment custody credits to the baseline terms for SYTF commitments. The court properly deducted the credits from L.L.'s maximum term of commitment.

### 2.2. The court's deduction of L.L.'s precommitment custody credits to the maximum term of confinement was not a violation of his equal protection rights.

L.L. argues that equal protection principles require the application of his precommitment custody credits against the seven-year baseline term of confinement that the court set under section 875, subdivision (b). He contends a failure to apply the credits against the baseline term would treat wards committed to a county SYTF unequally in comparison to wards committed to the DJJ even though SYTFs are the functional equivalent of the DJJ. We again disagree.

17

"The equal protection clause of the Fourteenth Amendment to the United States Constitution provides that no state may 'deny to any person within its jurisdiction the equal protection of the laws.' [Citation.] This provision is 'essentially a direction that all persons similarly situated should be treated alike.' [Citation.] 'At core, the requirement of equal protection ensures that the government does not treat a group of people unequally without some justification.' [Citation.]" (*People v. Hardin* (2024) 15 Cal.5th 834, 847, fn. omitted.) "The degree of justification required to satisfy equal protection depends on the type of unequal treatment at issue. Courts apply heightened scrutiny when a challenged statute or other regulation involves a suspect classification such as race, or a fundamental right such as the right to vote, and accordingly will demand greater justification for the differential treatment. [Citations.] But when a statute involves neither a suspect classification nor a fundamental right, the 'general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest.' [Citations.] A court applying this standard finds 'a denial of equal protection only if there is no rational relationship between a disparity in treatment and some legitimate government purpose.' [Citation.]" (*Ibid.*) Both parties agree that rational basis review applies here. "Under this deferential standard, we presume that a given statutory classification is valid 'until the challenger shows that no rational basis for the unequal treatment is reasonably conceivable.' [Citation.]" (*Id.* at p. 852.)

We need not address whether there is a rational basis for disparity in treatment as we are not persuaded that a disparity exists. In *M.B.*, Division Four of the First District concluded that

18

"the statutes governing SYTF commitments and the application of precommitment credits in that context already do operate in the way *Ernesto L.* determined the statutes should operate in the DJJ context" and, therefore, "there is no disparate treatment that could give rise to an equal protection problem." (*M.B.*, *supra*, 99 Cal.App.5th at pp. 466–467.) It observed that the maximum custodial term for DJJ commitments under section 731, subdivision (b), is the functional equivalent of the maximum term of confinement set by section 875, subdivision (c), and that precommitment custody credits must be applied against those analogous maximum terms. (*M.B.*, at p. 468.) The *M.B.* court also noted that "the baseline term under section 875, subdivision (b), is not a maximum term," but instead " 'represent[s] the time in custody necessary to meet the developmental and treatment needs of the ward and to prepare the ward for discharge to a period of probation supervision in the community.' " (*M.B.*, at p. 468, quoting § 875, subd. (b)(1).) The baseline term's closest analogue in the DJJ context would be the set of DJJ discharge consideration date guidelines that are temporarily to be borrowed in setting the baseline term under section 875. (*M.B.*, at p. 468; see also § 875, subd. (b)(1) [pending the development of offense-based classifications by the Judicial Council, the baseline term is to be set using the " 'discharge consideration date guidelines' " applied by the DJJ prior to its closure].) "Those guidelines existed alongside the court's duty to set a maximum term for a ward committed to the DJJ under section 731, subdivision (b), just as a court that now commits a ward to an SYTF must set both a baseline term and a maximum term of confinement under section 875, subdivisions (b) and (c)." (*M.B.*, at p. 468.)

19

We find the court's reasoning in *M.B.* persuasive. Although L.L. acknowledges *M.B.*, he does not meaningfully address or refute its reasoning.[5]

---

[5] Even if there *were* disparate treatment, we agree with the Attorney General that there is a rational basis for applying precommitment credits to the maximum term of confinement rather than the baseline term. As discussed, the baseline term is tailored to the ward's "developmental and treatment needs" and preparation for discharge from custody. (§ 875, subd. (b)(1).) As the Attorney General contends, "if a ward's baseline term could be consumed by precommitment custody credit[s] before he has had a meaningful opportunity to engage in treatment, the stated purpose of setting the baseline term would rarely be achieved."

## DISPOSITION

The order is affirmed.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


LAVIN, Acting P. J.

WE CONCUR:


EGERTON, J.


ADAMS, J.

21